(No. 6300.   May 1, 1936.)

P. E. JOHNSON, Appellant, v. BEN DIEFENDORF, Commissioner of Finance, Respondent.

[57 Pac. (2d) 1068.]

Oppenheim & Lampert, for Appellant.

Geo. Donart and J. F. Martin, for Respondent.

MORGAN, J.—This action was commenced by several retail merchants on behalf of themselves and others like situated, against respondent, who is Commissioner of Finance of Idaho, to procure an injunction restraining the collection of a tax on purchases of personal property, required to be collected by chap. 12 of the First Extraordinary Session of the Legislature of 1935, commonly called the sales tax law, and from attempting to enforce that act. Section 6 thereof is as follows:

"From and after the fifteenth day of March, 1935, and to and including the fifteenth day of March, 1937, there is hereby imposed a tax of two per cent (2%) of the gross receipts upon every 'retail sale' or 'sale at retail' as defined in this act. Such tax shall be paid at the time and in the manner hereinafter provided, and shall be in addition to any and all other taxes."

Section 8 provides:

"The retailer shall collect the tax from the consumer, but in no case shall he collect as tax an amount (without regard

to fractional parts of one cent) in excess of the tax computed at the rates prescribed by this act.''

That section also requires the retailer, on or before the 15th of each month, to make a verified return to the department of finance for the preceding month and remit to it all taxes due arising from taxable purchases made from him.

There was lack of uniformity of opinion throughout the state as to the amount of tax to be collected. No express provision was made for the collection of a tax which amounted to a fractional part of a cent, and it was respondent's contention that each retailer should collect from purchasers, account for and pay over, 2% on the gross aggregate of his sales. This was disputed by many merchants and it was contended by some that the act was unconstitutional in many particulars. A petition was prepared, circulated, signed and filed with the secretary of state, in conformity to the referendum statute, demanding a reference of the act to the voters.

The record shows appellant is a retail merchant, conducting his business in Idaho, and that he has neither collected nor paid over to the state the tax on any purchase made from him. It was alleged in the complaint and admitted in the answer that respondent threatened, if plaintiffs failed to pay the tax of 2% on gross sales, to revoke their licenses, hold hearings on the revocation thereof and prosecute them under the provisions of the act.

The trial resulted in a decree enjoining defendant from requiring collection from any purchaser, and from collecting from either plaintiff a sum in excess of 2%, computed separately, on the price of each and every taxable purchase and, in case computation of the amount due as tax includes a fractional part of a cent, such fractional part shall not be collected, nor accounted for. The decree required plaintiffs to pay to defendant all moneys theretofore collected by them as tax, together with interest thereon, and denied them all relief prayed for in their complaint, except as above set out. Appellant was a plaintiff and he, alone, appealed.

The questions presented to the trial court as to whether the tax shall be computed on the gross aggregate of taxable sales, or on each purchase separately, and as to what shall

be collected when the computation of the tax results in a fractional part of a cent, are not before us. Appellant concedes, if the tax is collectible, it should be computed as by the decree directed.

Appellant contends the legislature, in the enactment of the sales tax law, violated art. 3, sec. 16, of the constitution, which provides:

"Every act shall embrace but one subject and matters properly connected therewith, which subject shall be expressed in the title; but if any subject shall be embraced in an act which shall not be expressed in the title, such act shall be void only as to so much thereof as shall not be embraced in the title."

The title to the act under consideration is .as follows:

"An act to provide for the method and manner of raising revenue for emergency purposes by imposing a tax upon the retail purchase of certain commodities, admissions and services and for the ascertainment, assessment and collection of said taxes; to provide for the distribution of said revenue and for penalties for the violation of the terms of this act; making appropriations for the administration of this act, for refunds thereunder, for the cooperative emergency revenue fund, the state board of education for use of common schools, in distress; the public school income fund, the general fund of the State of Idaho, and declaring an emergency."

Section 4 of the act declares it unlawful for any wholesaler or retailer to engage or continue in business within the state, after March 15, 1935, without obtaining an annual license to do so, which shall be issued to him by the department of finance on payment of a fee of $2.00. It also provides for the revocation of the license of any person who violates any provision of the act, and prohibits the issuance of another license to him within two years.

The purpose of the legislature to provide for a tax on the retail purchase of certain commodities is expressed in the title, but there is nothing therein contained to indicate a legislative intention to require a wholesale or retail dealer to procure a license in order to conduct his business. No

suggestion of the contents of sec. 4 is to be found in the title.

Requirement that dealers be licensed and their licenses be revoked for violation of the sales tax law are matters properly connected with the subject of the act, which is the taxing of purchases, for thereby their cooperation in collecting and accounting for the tax may be promoted. Therefore, sec. 4 does not violate the first requirement of the constitution, art. 3, sec. 16, which is that an act shall embrace but one subject and matters properly connected therewith. (*First Security Bank of Idaho v. Fremont County*, 55 Ida. 76, 37 Pac. (2d) 1101.) Although sec. 4 is properly connected with the subject-matter of the act, it treats of an important subject, not embraced in the title, to-wit, the licensing of wholesale and retail dealers; the cause for which their licenses may be revoked, and the effect thereof, and violates the prohibition against including a subject in an act not expressed in the title. This makes applicable the part of sec. 16 which provides, "such act shall be void only as to so much thereof as shall not be embraced in the title." (*Federal Reserve Bank v. Citizens B. & T. Co.*, 53 Ida. 316, 23 Pac. (2d) 735; *Twin Falls Bank & Trust Co. v. Pringle*, 55 Ida. 451, 43 Pac. (2d) 515.) The inclusion of sec. 4 in the act, without making reference to it in the title, is violative of art. 3, sec. 16, of the constitution, but that does not invalidate other portions of the act.

It is urged by appellant that the act violates the constitution, art. 7, sec. 5, which requires uniformity of taxation on the same class of subjects within the territorial limits of the authority levying the tax, because it exempts transactions involving sales of motor vehicle fuel on which the state has heretofore imposed a tax, so long as such tax shall continue in force; sales made by religious, educational, charitable and eleemosynary institutions in the conduct of their regular functions and activities, and sales of farm products and livestock by the grower or producer thereof. The section of the constitution relied on applies to *ad valorem* taxes and not an excise tax such as is the one here under consideration. (*In re Kessler*, 26 Ida. 764, 146 Pac. 113, Ann. Cas. 1917A, 228, L. R. A. 1915D, 322; *State v. Nelson*,

36 Ida. 713, 213 Pac. 358; *Hartman v. Meier*, 39 Ida. 261, 227 Pac. 25; *Smallwood v. Jeter*, 42 Ida. 169, 244 Pac. 149; *Diefendorf v. Gallet*, 51 Ida. 619, 10 Pac. (2d) 307; *J. C. Penney Co. v. Diefendorf*, 54 Ida. 374, 32 Pac. (2d) 784; *Garrett Transfer Co. v. Pfost*, 54 Ida. 576, 33 Pac. (2d) 743.)

Appellant insists the act violates the clauses of the Fourteenth Amendment to the Constitution of the United States and of art. 1, sec. 13, of the Constitution of Idaho, which prohibit taking property without due process of law. He points out that one selling commodities, upon the purchase of which a tax is exacted from the purchaser, is required, against his will, to collect it, report its collection, and pay it to the state without compensation; that he is required to pay the tax whether he collects it or not, and that he is subjected to penalties for failure to properly perform this duty. The portions of the act which refer to penalties, and the method provided for their enforcement, will be hereinafter discussed.

A contention that to make a vendor the tax collector, against his will and without compensation, violates the constitutional provisions against taking property without due process of law, is disposed of by the Supreme Court of the United States in *Pierce Oil Corp. v. Hopkins*, 264 U. S. 137, 44 Sup. Ct. 251, 68 L. ed. 593, at 596, in the following language, applicable to this case:

"The claim that the act violates the due process clause rests upon the argument that the tax levied is a privilege tax for the use of the highways by the purchasers; that the seller is required to pay the tax laid on the purchasers; that, unlike those cases where a bank is required to pay taxes assessed against stockholders or depositors . . . . the seller is not afforded the means of reimbursing himself; and that, moreover, the mere process of collecting the tax from the purchaser, and making monthly reports and payments, subjects the seller to an appreciable expense. A short answer to this argument is that the seller is directed to collect the tax from the purchaser when he makes the sale; and that a state which has, under its constitution, power to regulate the business of selling gasoline (and doubtless, also, the power to tax the privilege of carrying on that business), is not pre-

vented by the due process clause from imposing the incidental burden.''

■ Appellant complains he and other retailers are denied due process of law by the penalties, and methods provided for their enforcement, and by the arbitrary powers conferred on the commissioner, to be exercised in making collections from them, in the following particulars, among others:

''They are subject to having a cloud upon the title of their personal or real property through the filing of a lien, having the force and effect and status of a judgment of court, and this even though they may not have collected the money from the purchaser, and without hearing before a judicial tribunal.

''They are subjected to the confiscation and sale of their property, both real and personal, upon failure to pay amounts found to be due from them by the Commissioner of Finance.''

These specifications present for review section 17 and parts of sections 18, 19 and 24 of the act, which are as follows:

Sec. 17. ''If fraud or evasion on the part of a retailer is discovered by the commissioner, he shall determine the amount by which the State has been defrauded, shall add to the amount so determined a penalty equal to twenty-five per cent thereof, and shall assess the same against the retailer; the amount so assessed shall be immediately due and payable.''

Sec. 18. ''In any case in which any tax, interest or penalty imposed under this Act is not paid when due the commissioner may file for record in the recorder's office of any county a notice of lien specifying the amount of the tax, interest or penalty due and the name of the retailer liable for the same. From the time of filing any such notice the amount of the tax specified in such notice shall have the force and effect of the lien of a judgment duly docketed against the retailer named in said notice of lien for the amount specified in such notice. . . . .

''In the event that any retailer is delinquent in the payment of the tax herein provided for, the commissioner may give notice of the amount of such delinquency, by registered

mail to all persons having in their possession or under their control, any credits or other personal property belonging to such retailer, or owing any debts to such retailer at the time of receipt by them of such notice and thereafter any person so notified shall neither transfer nor make any other disposition of such credits, other personal property or debits until the commissioner shall have consented to a transfer or disposition, or until twenty days shall have elapsed from and after the receipt of such notice. All persons so notified must, within five days after receipt of such notice, advise the commissioner of any and all such credits, other personal property or debts, in their possession, under their control or owing by them, as the case may be."

Sec. 19. "At any time within two years after any retailer is delinquent in the payment of the tax herein provided for, the commissioner may proceed forthwith to collect the tax due from the retailer in the following manner; the commissioner shall seize any property of the retailer, real or personal, and thereafter sell at public auction such property so seized, or a sufficient portion thereof, to pay the tax due hereunder, together with any interest or penalties imposed hereby for such delinquency, and any and all costs that may have been incurred on account of such seizure and sale. . . . . "

Provision is made for giving notice of sale, and it is further provided:

"At any such sale, the property shall be sold by the commissioner in accordance with law and said notice, and the commissioner shall deliver to the purchaser a bill of sale for the personal property, and a deed for any real property so sold, and such bill of sale or deed shall vest any interest or title of the retailer in the purchaser. The unsold portion of any personal property so seized may be left at the place of sale at the risk of the retailer." . . . .

Sec. 24. "No injunction or writ of mandate or other legal or equitable process shall issue in any suit, action or proceeding in any court against the state or against any officer thereof, to prevent or enjoin under this act the collection of any tax sought to be collected; but after payment of any such tax under protest duly verified and setting forth the

grounds of objection to the legality of such tax, any person having paid such tax may bring an action against the state treasurer in a court of competent jurisdiction in the County of Ada for the recovery of the tax so paid under protest. No such action may be instituted more than sixty days after such tax has been paid, and failure to bring suit within said sixty days shall constitute waiver of any and all demands against the state on account of such payment. No grounds of illegality of the tax shall be considered by the court other than those set forth in the protest filed at the time of the payment of the tax. . . . .

"In no case shall any judgment be rendered in favor of the plaintiff in any action brought against the state treasurer to recover any tax paid hereunder, when such action is brought by or in the name of an assignee of any person paying said tax, or by any person other than the person who has paid such tax."

In *Mays v. District Court,* 34 Ida. 200, 207, 200 Pac. 115, 116, it is said:

"Due process of law requires that one be heard before his rights are adjudged."

In *Abrams v. Jones,* 35 Ida. 532, 546, 207 Pac. 724, 727, it is said:

"Due process of law is not necessarily satisfied by any process which the legislature may by law provide, but by such process only as safeguards and protects the fundamental, constitutional rights of the citizen."

When a retailer has in his possession taxes which he has collected from purchasers, and fails to account for and pay over the money due from him, it may be collected by legal proceedings provided for like cases, but to place in the hands of the agent of his creditor such arbitrary powers as are attempted to be conferred by sections 17, 18, 19 and 24 is to deny to the debtor due process of law, in violation of Idaho Constitution, art. 1, sec. 13, and the Fourteenth Amendment to the Constitution of the United States.

Appellant contends the act, and particularly section 24 thereof, attempts to deprive the judicial department of power and jurisdiction which rightly pertains to it as a co-

ordinate branch of government. This contention is well founded. Article 2 of the constitution is as follows:

"The powers of the government of this state are divided into three distinct departments, the legislative, executive and judicial; and no person or collection of persons charged with the exercise of powers properly belonging to one of these departments shall exercise any powers properly belonging to either of the others, except as in this constitution expressly directed or permitted."

Article 5, sec. 2 vests the judicial powers of the state in "a court for the trial of impeachments, a supreme court, district courts, probate courts, courts of justices of the peace, and such other courts inferior to the supreme court as may be established by law for any incorporated city or town"; sec. 13 of that article expressly forbids the legislature "to deprive the judicial department of any power or jurisdiction which rightly pertains to it as a coordinate department of the government," and art. 1, sec. 18 provides: "Courts of justice shall be open to every person, and a speedy remedy offered for every injury of person, property or character, and right and justice shall be administered without sale, denial, delay, or prejudice."

Neither the department of finance nor its commissioner belongs to the judicial branch of government, and the legislature is prohibited by the constitution from conferring judicial powers on them. The powers sought to be conferred by sec. 17, and the quoted parts of secs. 18 and 19 belong to the judicial department. It is sought by sec. 24 to close the doors of justice and to deny to persons, deprived of their property without due process of law, a speedy remedy for the injury thereby inflicted on them. These portions of the act violate art. 2, secs. 2 and 13 of art. 5, and sec. 18 of art. 1 of the constitution.

■ ■ These sections of the act relate to enforcement of payment to the state, by the retailer, of the taxes collected by him, and have nothing to do with the amount of the tax, the duty of the purchaser to pay it, nor the duty of the retailer to collect it, account for it and pay it to the state, nor with the purposes for which the state shall use it. These matters are all taken care of in other parts of the act. The

means sought to be provided for enforcing payment by the retailer to the state are but incidental to the purposes of the act. They were designed to be supplemental, in cases to which it was intended to apply them, to remedies of general application and are not indispensable to successful operation of the law.

In *Gillesby v. Board of County Commissioners,* 17 Ida. 586, 604, 107 Pac. 71, 77, the court, quoting from Lewis' Sutherland on Statutory Construction (2d ed., vol. 1, sec. 296) stated the rule by the application of which those portions of the act under consideration here, which do not violate the constitution, will be sustained. It is:

''The court is not warranted in declaring the whole statute void unless all the provisions are connected in subject matter, depend on each other, were designed to operate for the same purpose, or are otherwise so dependent in meaning that it cannot be presumed that the legislature would have passed one without the other. The constitutional and unconstitutional provisions may even be expressed in the same section, or even in the same sentence, and yet be perfectly distinct and separable, so that the first may stand though the last fall.''

See, also, *Epperson v. Howell,* 28 Ida. 338, 154 Pac. 621; *Carlson v. Mullen,* 29 Ida. 795, 162 Pac. 332.

The validity of the act was questioned by counsel for appellant, in their brief and oral arguments, on a number of grounds not stated in the complaint nor submitted to the trial judge. Because they are urged for the first time on appeal, they will not be discussed nor decided. (*Curtis v. Pfost,* 53 Ida. 1, 21 Pac. (2d) 73; *Garrett Transfer etc. Co. v. Pfost,* 54 Ida. 576, 33 Pac. (2d) 743.)

In this act an emergency was declared to exist, and there is disagreement as to the effect of that declaration on the right to refer the law for the approval or rejection of the voters, and as to the effect of such reference on its operation pending the referendum vote. Appellant contends the referendum, petitioned for as by law required, has the effect of suspending the operation of the act until the election thereon. Respondent contends the act, being an emergency measure, is not subject to referendum. These contentions

make necessary the consideration of art. 1, sec. 2, art. 3, secs. 1 and 22 of the constitution, and chap. 210, sec. 3, 1933 Sess. Laws, page 433.

The absolute right of the people of Idaho to govern themselves, and to alter, reform or abolish their government, is recognized in the constitution and is expressed in art. 1, sec. 2 thereof, in this language:

"All political power is inherent in the people. Government is instituted for their equal protection and benefit, and they have the right to alter, reform or abolish the same whenever they may deem it necessary; . . . . "

As originally written and adopted, the constitution made no provision for direct legislation. Article 3, sec. 1, provided: "The legislative power of the state shall be vested in a senate and house of representatives. . . . . " An amendment was proposed by the eleventh session of the legislature (1911), which was adopted at the next succeeding general election, whereby the following was included in that section:

"The people reserve to themselves the power to approve or reject at the polls any act or measure passed by the legislature. This power is known as the referendum, and legal voters may, under such conditions and in such manner as may be provided by acts of the legislature, demand a referendum vote on any act or measure passed by the legislature and cause the same to be submitted to a vote of the people for their approval or rejection."

The amendment also contains a provision for the initiation and enactment of laws by the people, but it is not involved in this case.

Our constitutional provision for referendum differs from all others we have examined. Constitutions which designate classes of laws that may, or may not, be referred to the voters for their rejection or approval, or which provide when laws referred shall become operative, differ so materially from ours that decisions interpreting and applying them are of no help to us.

There is no conflict between the section of the constitution providing for referendum and the section making emergency laws immediately effective. The conflict, if one exists, is between the constitutional provision relating to emergency laws

and the statutory provision relating to the effective date of an emergency act submitted to referendum vote.

Provision to the effect that an act "referred to the people shall take effect and become a law when it is approved by a majority of the votes cast thereon, and not otherwise," is to be found in the constitution of some states, but it is not in ours. In Idaho that is a statutory provision which, if it was intended to prevent the legislature from making emergency laws effective immediately upon their approval by the governor, is in conflict with the part of the constitution which relates to emergency laws, and it is ineffectual to prevent what the constitution has provided for.

Article 3, sec. 22 of the constitution provides: "No act shall take effect until sixty days from the end of the session at which the same shall have been passed, except in case of emergency, which emergency shall be declared in the preamble or in the body of the law."

Counsel for respondents, after quoting that section in their brief, state: "This is interpreted by our supreme court in case of *State v. Cleland* (42 Ida. 803, 248 Pac. 831) to mean that an emergency act goes into effect at once." The language used by the court in that case should not be so construed. It is: "Since the act carried an emergency clause and was approved by the Governor on March 10, 1925, it became effective on that day."

Incorporated in the act (Sess. Laws 1925, chap. 177) which the court had under consideration, was a declaration that an emergency existed therefor and that it should "take effect and be in force and effect from and after its passage and approval." The law was held to have become effective immediately on its approval because the constitution, by art. 3, sec. 22, permitted the legislature to, and it did, make it effective then. That section fixes the time when laws shall take effect, for which there is no emergency, to be not less than sixty days from the end of the session at which they have been passed, but in case of emergency, which is declared in the preamble or in the body of a law to exist, there is no restriction and it is left to the discretion of the legislature to fix the time when it shall go into effect. The language

employed in art. 3, sec. 22, leaves no room for any other interpretation.

The constitutional provision for referendum is not self-operating, and it was dormant until the legislative session of 1933, which enacted chap. 210, laws of that year, sec. 3 of which is as follows:

"Referendum petitions with the requisite number of signatures attached shall be filed with the Secretary of State not more than sixty days after the final adjournment of the session of the State Legislature which passed on the bill on which the referendum is demanded. All elections on measures referred to the people of the state shall be had at the biennial regular election. Any measure so referred to the people shall take effect and become a law when it is approved by a majority of the votes cast thereon, and not otherwise."

What is meant by the last sentence of that section? Is it to be construed to mean that, although the constitution reserves to each legislative session the right when emergency for the enactment and operation of a law arises, to fix the time when such law shall become effective and, when necessary, make it effective immediately upon its approval by the governor, the 1933 session could, nevertheless, fix the date when emergency laws submitted to referendum vote shall become effective when they are approved by a majority of the votes cast thereon and not otherwise? To so hold is to decide that the 1933 session of the legislature has substituted its wisdom and decision for that of future sessions, with respect to future emergencies, and has amended the constitution and deprived its successors of the power to make laws, for the enactment and operation of which emergencies exist, effective when approved by the governor. A legislative session is not competent to deprive future sessions of powers conferred on them, or reserved to them, by the constitution. 1933 Sess. Laws, chap. 210, sec. 3, must be construed according to the rule frequently announced in this state, to the effect that where a statute would be unconstitutional as applied to a certain class of cases and constitutional as applied to another, it should be held to have been intended by the legislature to apply to the latter class and not to the

former. (*In re Gale,* 14 Ida. 761, 95 Pac. 679; *Northern Pacific Ry. Co. v. Gifford,* 25 Ida. 196, 136 Pac. 1131; *State v. Morris,* 28 Ida. 599, 155 Pac. 296, L. R. A. 1916D, 573; *Hindman v. Oregon Short Line R. R. Co.,* (on rehearing) 32 Ida. 140, 178 Pac. 839; *Hall v. Johnson,* 53 Ida. 667, 27 Pac. (2d) 674.) In *State v. Morris* we quoted from *Grice v. Clearwater Timber Co.,* 20 Ida. 70, 117 Pac. 112, as follows:

" 'Whenever an act of the legislature can be so construed and applied as to avoid conflict with the constitution and give it the force of law, such construction will be adopted by the court.' Continuing, it is said in the opinion: (*Grice v. Clearwater Timber Co.*) 'And it is held by many courts that where there is room for two constructions of a statute, both equally obvious and equally reasonable, the court must, in deference to the legislature of the state, assume that it did not overlook the provisions of the constitution and designed the act to take effect.' "

Following that rule we hold the part of sec. 3, chap. 210, 1933 Sess. Laws, which fixes the time when legislative acts become effective, applies to acts for the operation of which no emergency exists and for which a referendum has been petitioned, and does not apply to, nor postpone the effective date of, emergency acts.

It having been, by the constitution, left to each session of the legislature to decide for itself, at the time of the enactment of a law, whether or not an emergency exists for its immediate operation, and to fix the time when it shall become effective, it was competent for the First Extraordinary Session of 1935, when it enacted chapter 12, to include, as it did, section 35 therein, as follows:

"EMERGENCY.—An emergency existing therefor, which emergency is hereby declared to exist, this Act shall be in force and effect from and after its passage and approval by the Governor."

The right to approve or reject a law which is in full force and effect is not beyond the political powers of the people of Idaho, as specified in and safeguarded by sec. 2, art. 1 of their constitution, nor is it inconsistent with the proper exercise of these powers that they put, and continue, emergency laws in effect pending a referendum vote thereon, as

they have, by sec. 22, art. 3 thereof, permitted the legislature to provide for.

If an emergency actually exists and is declared in the preamble or in the body of the act to exist, the law immediately goes into effect and remains effective until and unless it is defeated at the referendum election, or is repealed. This is as it should be. It would be unwise to permit the small number of voters required to initiate a referendum to delay, by petitioning for one, the operation of a law for which an emergency actually exists.

Whether it is for the legislature or the court to say, finally, as to the existence of an emergency within the meaning of the constitution, is not before us. It was stipulated at the trial, in substance, that an emergency existed for the enactment of this law.

The contention that because the act is an emergency measure it is not subject to referendum cannot be sustained. That contention conflicts with the plain statement in sec. 1, art. 3 of the constitution that "the people reserve to themselves the power to approve or reject at the polls *any act or measure passed by the legislature.*" This does not mean the right is reserved to approve or reject some acts and not others, nor that the legislature may, by declaring an emergency, defeat the will of the people. The language is plain, is all inclusive and must be and is held to mean what it says.

The trial judge made conclusions of law to the effect that the act of the legislature here under consideration is, in all respects, constitutional and valid and that it is not subject to a referendum vote. The making of these conclusions is assigned as error, and we find them to be erroneous.

The cause is remanded to the district court with instructions to amend the decree, with respect to the rights of appellant, so as to conform to the views herein expressed. No costs are awarded.

Holden, J., concurs.

Ailshie, J., deeming himself to be disqualified, did not sit with the court at the hearing nor participate in the decision.

BUDGE, J., Specially Concurring.—I concur in the majority opinion in the following particulars: (a) That the title of the act does not violate Const., art. 3, sec. 16, except in the particulars pointed out in the opinion; (b) that the act is not unconstitutional in that it violates art. 7, sec. 5, in that said act attempts to levy a tax upon the sale of all tangible personal property, but unduly excepts sales of certain motor vehicle fuels; (c) that said act is not unconstitutional in that it attempts to exempt all sales of farm products or livestock when sold by the growers or producers thereof; (d) that said act is not unconstitutional for the reason that it is discriminatory in that it exempts all sales of tangible property made by religious, educational, charitable and eleemosynary institutions in the conduct of regular religious, educational, charitable and eleemosynary activities, for the reason as stated in the opinion.

I further concur in the opinion wherein it is held that the act is not in violation of the constitution in that it makes vendors tax collectors. The trial court did not err in refusing to declare the act null and void, inoperative and ineffective. In my opinion the court erred in holding, in conclusion number two, that the act was not subject to referendum vote and was correct in holding that the provisions of said law were not suspended or affected by the filing with the Secretary of State of the referendum petitions. Under the constitution and statute ten per cent of the electors of the state by referendum petition in regular form circulated, signed and filed in compliance with the provisions of the law, may have any act of the legislature referred to a vote of the people for approval or rejection. Const., art. 3, sec. 22, provides that laws for which there is no emergency shall not take effect until sixty days from the end of the session at which they are passed, but in case of emergency legislation, which emergency shall be declared in the preamble or in the body of the law, there is no constitutional restriction and it is left to the discretion of the legislature to fix the time when such legislation shall go into effect.

An act carrying an emergency clause, when approved by the Governor becomes a law effective upon the date of its approval or thereafter as fixed in the law. Why the legisla-

ture provided that measures referred to the people under the referendum statute should be voted on at the biennial regular election next succeeding the passage of the act instead of fixing an earlier date, thus affording the electors an earlier opportunity to accept or reject any act referred under the referendum statutes, affords no ready answer. However, it was within the power of the legislature, the act carrying an emergency clause, to provide that the act should go into effect when signed and approved by the Governor.

It seems to me that there is no way to escape holding that Session Laws 1933, chap. 210, sec. 3, p. 431, conflicts with the provisions of Const., art. 3, sec. 22, which provides no act shall take effect until sixty days from the end of the session at which the same shall have been passed, *except in case of emergency,* which emergency shall be declared in the preamble or body of the law. I am unable to bring myself to believe that the legislature surrendered its constitutional right to enact legislation to take immediate effect and to meet emergencies that might be acute and vital, or that it placed it within the power of ten per cent of the voters to suspend such ''laws of immediate or pressing importance'' and which laws might be ''most wholesome and necessary for the public good,'' such as emergency appropriation measures for governmental, educational, penal, charitable and relief purposes. In other words, to have placed it within the power of ten per cent of the voters to suspend or hold in abeyance for a period of practically twenty months, or until the biennial election next succeeding the passage of the act, by referendum petitions, such emergency measures as well as ordinary acts or measures, the result could well be disastrous to the peace and welfare of the citizens of the state, in that governmental activities might be suspended.

In my opinion to hold the enforcement of the instant act suspended would be both in violation of Const., art. 3, sec. 22, and contrary to the intention of the legislative will, resulting in litigation and confusion.

The percentage that should be paid by the purchaser is not before us, no cross-appeal having been taken by the state.

There are other questions discussed in the opinion, in briefs of counsel and at the oral argument, involving the

rights and remedies of the state in the enforcement of the act against collectors of the tax, as well as rights and remedies afforded the collectors of the tax. Until a concrete case is presented involving the construction of these particular sections of the act (which may or may not come before this court), the necessity of passing upon them is not apparent and as to those matters I express no opinion.

GIVENS, C. J., Concurring in Part and Dissenting in Part.—I concur except as to the discussion of the effective date of an emergency statute after a referendum petition has been filed, etc.

At common law statutes generally became effective from the opening day of the legislative session, which rule was never generally adopted in this country where statutes were generally considered as effective from the date of their passage and approval, and also it was universally recognized that the legislature had the right and power to fix in the statute itself the effective date. (59 C. J. 1137, 1148; vol. 1, Sutherland's Statutory Construction, second edition, p. 308, sec. 172 et seq.; 23 Cal. Jur., "Statutes," p. 620, sec. 21; 25 R. C. L., "Statutes," pp. 796–803, secs. 44–51.) Therefore in the absence of section 22 of article 3 of the state Constitution or any other such provision in the Constitution there would have been no limitation upon the legislature in fixing the effective date of its statutes. Therefore the first clause of section 22 of article 3 was a limitation upon what would otherwise have been, except as to the interdiction of *ex post facto* laws in section 16, article 1, or similar restrictive provisions of the state or federal Constitutions, the legislature's uncontrolled power in the particular involved, and the second clause of section 22 of article 3 was not a grant of power generally but was an exception to the first restrictive clause in said section 22. The second clause, however, still left it with the legislature to fix the effective date allowing the legislature to make the effective date of emergency statutes less than the 60-day period otherwise controlling. Section 22 does not as a part of the Constitution, i. e., a constitutional pronouncement, make an emergency act effective less than 60 days after its passage but merely permits that to be done by

the legislature, and the fixing of the effective date is a legislative function of no higher dignity than any other legislative act. When the legislature in 1933, by chapter 210, page 433, 1933 Session Laws, made section 1, article 3 of the Constitution effective and provided the machinery for referring acts of the legislature to a direct vote of the people the legislature had the right to determine the effective date of statutes so referred; as to general statutes because while section 22, *supra*, says no act shall take effect until 60 days from the end of the session at which the same shall have been passed it does not provide that the legislature may not set an effective date after that time, and as to emergency legislation the legislature had the right with reference to the functioning of the referendum to enact a special statute as they did in chapter 210, *supra*, applicable to statutes when referred.

There are obviously many various factors which may have influenced the legislature in prescribing the particular machinery they did in chapter 210, *supra*, which are not, however, at this time for judicial consideration or determination. Starting with Justice Morgan's correct premise in holding that section 1, article 3, of the Constitution applies to all legislative acts, general as well as emergency, leads, it seems to me, to the conclusion that the referendum legislation, chapter 210, 1933 Session Laws, must apply to all legislative acts, general or emergency. There is no conflict between provisions of the Constitution, or between the statutes, or between the Constitution and the statutes, but to say that chapter 210, *supra*, does not apply to emergency laws is reading into it an exception not put there by the legislature. Furthermore, section 1 of article 3, *supra*, provides that the legislature is to provide the "conditions" and "manner" of the exercise of the referendum. The word "manner" is defined as "the way of doing anything," "method of procedure," "mode," "practice" (Standard Dictionary); "a way of acting," "mode or procedure," "the mode or method by which something is done or by which anything happens" (Webster's Dictionary). This word would have been therefore sufficient to authorize the way in which the law should be referred and how the election should be conducted. The framers of the

Constitution must have meant that the legislature had power beyond this in using the word "conditions," which word is thus defined: "a qualification or limitation annexed to an agreement, by which it may be continued, altered, or rendered of no effect upon the performance or nonperformance of something, or the happening or not happening of an uncertain event" (Standard Dictionary); "something established or agreed upon as a requisite to the doing or taking effect of something else; a stipulation or provision," "that which exists as an occasion of something else; a circumstance essential to the appearance or occurrence of something else; a prerequisite," "that which limits or modifies the existence or character of something; a circumstance of action or being; an environmental incident; a restriction or qualification." (Webster's Dictionary.) This definition would seem to clearly include in its usage the fixing by the legislature of the effective date of any statute when referred.

It seems to me the proper legal and constitutional course is if section 3 of chapter 210, 1933 Session Laws, should be amended it be by the legislature rather than by judicial construction, and any act of the legislature until repealed, amended or modified is as binding on future legislators as any other group of citizens. The fatal inconsistency in the other construction contended for is that by such construction the referendum as to emergency laws is as emasculated as if section 1, article 3 of the Constitution were held to not apply to emergency laws at all, and ignores this part of section 3, chapter 210, *supra:*

" . . . . any measure so referred to the people shall take effect and become a law when it is approved by a majority of the votes cast thereon, and not otherwise."

While legislative interpretation is not decisive it is entitled to consideration. (*Fralick v. Guyer*, 36 Ida. 648, 213 Pac. 337; *Bannock County v. Citizens B. & T. Co.*, 53 Ida. 159, at 176, 22 Pac. (2d) 674; 12 C. J. 714, sec. 66; 6 R. C. L., "Constitutional Law," p. 63, sec. 60; 5 Cal. Jur. "Constitutional Law," p. 604, sec. 37; vol. I, Cooley's Constitutional Limitations, p. 147 et seq.) The legislature has fixed as to general not emergency statutes effective dates beyond 60

days, evidently considering they had such power.[1] Our court has not directly sanctioned such deferment but the following expressions tend at least to recognize such power: *Shoshone County v. Thompson,* 11 Ida. 130, at 141, 81 Pac. 73; *Gillesby v. Board of County Commrs.,* 17 Ida. 586, at 608, 107 Pac. 71; *Peavy v. McCombs,* 26 Ida. 143, at 149, 140 Pac. 965; *Idaho Power etc. Co. v. Blomquist,* 26 Ida. 222, at 237, 141 Pac. 1083, Ann. Cas. 1916E, 282; *Northern Pacific Ry. Co. v. Chapman,* 29 Ida. 294, at 299, 158 Pac. 560; and at least in the above instances such legislative postponement has, so far as I have discovered, remained unchallenged.

The above *résumé* it seems to me is pertinent in this, that if the legislature may extend the effective date of general statutes beyond the 60-day provision granted them in article

[1] 1890–1891 Session Laws, p. 33, approved Feb. 6, 1891, effective July 1, 1891; 1890–1891 S. L., p. 41, approved Feb. 11, 1891, effective July 1, 1891; 1895, S. L., p. 82, Act approved March 9, 1895, effective July 1, 1895; 1905 S. L., p. 99, approved March 6, 1905, effective second Monday of January, 1906; 1905 S. L., p. 145, approved March 8, 1905, effective July 1, 1905; 1907 S. L., p. 314, approved March 13, 1907, effective October 1, 1907; 1911 S. L., chapter 123, p. 385, approved Feb. 28, 1911, effective July 4, 1911; 1911 S. L., chapter 204, p. 673, approved March 10, 1911, effective September 1, 1911; 1913 S. L., chapter 76, p. 327, approved March 6, 1913, to take effect July 30, 1913; 1913 S. L., chapter 128, p. 475, approved March 11, 1913, effective second Monday in January, 1915; 1913 S. L., chapter 159, p. 527, approved March 12, 1913, effective Sept. 1, 1913; 1913 S. L., chapter 190, p. 628, approved March 14, 1913, effective July 1, 1913; 1917 S. L., chapter 81, p. 252, approved March 16, 1917, effective in part from July 1, 1917, remainder January 1, 1918; 1917 S. L., chapter 91, p. 314, approved March 15, 1917, effective January 1, 1919; 1917 S. L., chapter 107, p. 386, approved March 7, 1917, effective 18 months from passage and approval; 1917 S. L., chapter 109, p. 387, approved March 5, 1917, effective taxing year of 1918; 1917 S. L., chapter 125, p. 414, approved March 13, 1917, effective 6 months after passage and approval; 1919 S. L., chapter 149, p. 443, approved March 6, 1919, effective January 1, 1920; 1919 S. L., chapter 151, p. 474, approved March 3, 1919, effective January 1, 1920; 1919 S. L., chapter 154, p. 493, approved March 11, 1919, effective Jan. 1, 1920; 1919 S. L., chap. 157, p. 516, approved March 6, 1919, effective August 1, 1919; 1919 S. L., chapter 193, p. 578, approved

3, section 22, *supra,* they may extend the effective date of an emergency act when referred to the direct vote of the people under section 1 of article 3, *supra,* beyond what would otherwise be its effective date as an emergency measure. It seems to me that this construction of the statutes and provisions of the Constitution more nearly gives to the people the broad power and control of legislation which the people, as so aptly stated by Justice Morgan, the source of all governmental authority, expressly retained to themselves by section 1, article 3, of the Idaho Constitution.

The statute in question, therefore, is in abeyance until the decision by the people in the referendum vote, and I dissent from the contrary holding.

---

March 14, 1919, effective upon approval at next general election; 1921 S. L., chapter 177, p. 371, approved March 1, 1921, effective upon three conditions in the future; 1921 S. L., chapter 197, p. 400, approved March 7, 1921, effective September 1, 1921; 1923 S. L., chapter 75, p. 82, approved March 5, 1923, effective January 1, 1924; 1923 S. L., chapter 114, p. 144, approved March 9, 1923, effective January 1, 1924; 1923 S. L., chapter 162, p. 237, approved March 15, 1923, effective January 1, 1924; 1927 S. L., chapter 29, p. 31, approved Feb. 17, 1927, effective July 1, 1927; 1927 S. L., chapter 88, p. 107, approved March 1, 1927, effective Jan. 1, 1928; 1927 S. L., chapter 217, p. 311, approved March 12, 1927, effective July 1, 1927; 1927 S. L., chapter 244, p. 374, approved March 14, 1927, effective Jan. 1, 1928; 1927 S. L., chapter 245, p. 389, approved March 14, 1927, partially effective after July 1, 1927; 1927 S. L., chapter 260, p. 482, approved March 15, 1927, effective January 1, 1928; 1927 S. L., chapter 262, p. 546, approved March 15, 1927, effective July 1, 1927; 1929 S. L., chapter 39, p. 49, approved Feb. 21, 1929, effective June 1, 1929; 1929 S. L., chapter 56, p. 55, approved Feb. 21, 1929, effective July 1, 1929; 1929 S. L., chapter 70, p. 108, approved Feb. 26, 1929; effective July 1, 1929; 1929 S. L., chapter 196, p. 372, approved March 15, 1929, effective Dec. 1, 1929; 1929 S. L., chapter 233, p. 455, approved March 16, 1929, effective Jan. 1, 1930; 1931 S. L., chapter 122, p. 210, approved March 13, 1931, effective next fiscal year; 1931 Extra. S. L., chapter 2, p. 6, approved March 17, 1931, effective July 1, 1931; 1931 Extra. S. L., chapter 3, p. 57, approved March 17, 1931, effective July 15, 1931; 1933 S. L., chapter 113, p. 179, approved March 1, 1933, effective July 1, 1933; 1933 Extra. S. L., chapter 16, p. 29, approved July 1, 1933, effective upon ratification by Congress and Wyoming; 1935 S. L., chapter 88, p. 154, approved March 5, 1935, effective July 1, 1935.