(No. 6532. July 28, 1938.)

HOME OWNER'S LOAN CORPORATION, Respondent, v.
PRINCE E. STOOKEY and MINNIE E. STOOKEY,
His Wife, Appellants.

[81 Pac. (2d) 1096.]

Ben F. Tweedy, for Appellants.

Durham & Hyatt, for Respondent.

MORGAN, J.—Prince E. Stookey, one of the defendants, made and filed an affidavit, pursuant to 1933 Session Laws, chapter 218, section 4, page 464, that he had reason to believe, and did believe, defendants could not have a fair and impartial trial before Honorable Miles S. Johnson, Judge of the District Court of the Tenth Judicial District, by reason of his bias and prejudice against them. Defendants' attorney petitioned the governor to request another judge to try the case. In the petition the attorney recited, among other things, that the judges of the adjoining districts, especially in the northern part of the state, were likewise prejudiced and biased against the defendants in said action. That recitation was made in the petition, only, and was unverified. The affidavit on which the petition was based did not mention bias or prejudice of anyone other than Judge Johnson. The governor designated Judge Hodge, of the Second Judicial District, which adjoins Judge Johnson's district on the north, to hear and determine the case. Prince E. Stookey, made and filed his affidavit wherein he stated he had reason to believe, and did believe, he and his codefendant could not have a fair and impartial hearing or trial before Judge Hodge by reason of his bias and prejudice against the defendants. The affidavit concludes:

"Wherefore, the defendants move that the said Gillies D. Hodge call in a judge who is qualified to hear, try and decide the above entitled action."

We are unable to find in the record any ruling by Judge Hodge on this motion, but he tried and decided the case and we will proceed on the theory it was overruled.

Appellants have assigned as error the action of the governor in designating Judge Hodge to act in lieu of Judge Johnson, on the theory that he was also disqualified; also the action of Judge Hodge in proceeding with the trial of the case after the filing of the affidavit last above mentioned. While we are not invested with authority to review, on assignment of error, the acts of the chief executive of the state, we will say we know of no authority for disqualifying a group of judges, as was attempted to be done by the motion filed by

appellants' attorney. Idaho Session Laws 1933, chapter 218, provides that a party may file an affidavit

"that he has reason to believe, and does believe, he cannot have a fair and impartial hearing or trial before a district judge by reason of the bias or prejudice of such judge. . . . . Upon the filing of the affidavit, the judge as to whom said disqualification is averred shall be without authority to act further in the action, . . . . "

It is further provided in said section that only one judge may be disqualified at the instance of either of the parties.

Appellants insist the provision limiting the number of judges who may be disqualified by either party making such affidavit is unconstitutional, and that the effect of the 1933 amendment is to permit a party, by affidavits that judges are biased and prejudiced against him, to disqualify as many judges as he believes to be so biased and prejudiced, without stating any fact from which that conclusion may be drawn.

We hold the provision which limits the right of a party to so disqualify a judge is inseparably connected with the other portions of the act, and that if it be held to be unconstitutional, the entire act must fail. (*Epperson v. Howell,* 28 Ida. 338, 154 Pac. 621, and cases therein cited on this point; *United States Bldg. etc. Assn. v. France,* 56 Ida. 108, 50 Pac. (2d) 1015; *Johnson v. Diefendorf,* 56 Ida. 620, 57 Pac. (2d) 1068.) Although the act provides each party to an action may so disqualify one judge, by such an affidavit, we cannot believe it was the legislative purpose to make it possible for a litigant to disqualify, one by one, every judge in the state, by alleging the conclusion of bias and prejudice, without stating the facts from which it is drawn.

The act is not in conflict with the constitution, article 1, section 18, which provides:

"Courts of justice shall be open to every person, and a speedy remedy afforded for every injury of person, property or character, and right and justice shall be administered without sale, denial, delay, or prejudice."

Of course, a party who has disqualified one judge, by affidavit that he has reason to believe and does believe he cannot have a fair and impartial hearing or trial before said judge,

because of his bias and prejudice, is not required to go to trial before another judge who is actually biased and prejudiced against him. Article 1, section 18, forbids that. However, the act granting the right to a change of judges, by affidavits such as appellants filed, permitted them to disqualify only one judge by that method. If they desired to disqualify another one, it was necessary that they not only allege the conclusion of prejudice, but set out the facts showing it.

In the note, to secure which the mortgage herein sought to be foreclosed was given, it is provided:

"Time is of the essence hereof and in the event of default in payment of any installment for a period of ninety (90) days the holder of this note may, at its option, declare all the remainder of said debt due and collectable, and any failure to exercise said option shall not constitute a waiver of the right to exercise the same at any other time."

The mortgage contains this acceleration clause:

"Time is of the essence of this mortgage and of said note and in the event of a failure by the mortgagor to comply with any of the terms hereof, or failure to fully pay according to said note within Ninety (90) days next after the same is due then all sums hereby secured shall immediately become due and payable without notice or demand, at the option of the mortgagee, . . . . "

Appellants insist the debt evidenced by the note and secured by the mortgage is not due; that the acceleration clauses are not available to respondent, because the act of congress creating Home Owners' Loan Corporation does not provide that the due date of the debt may be accelerated by failure to conform to the terms of the contract.

An examination of the act fails to disclose any requirement that the parties might not contract for the debt to become due because of default in making payments according to the terms of the note and mortgage, and we fail to find anything in the law with which these acceleration clauses are inconsistent. In the act of congress it was not attempted to specify every detail of the contracts to be entered into between Home Owners' Loan Corporation, as mortgagee, and

the mortgagors with whom it deals. Appellants' contention that the acceleration clauses are void is without merit.

The mortgage also contains this provision:

"Mortgagors agree to pay and discharge before maturity all taxes, assessments, levies, liabilities, obligations or other encumbrances now subsisting or hereafter laid or imposed upon said property which may be in effect a prior charge thereon and to deliver the official receipts thereof to the Corporation, or a certificate signed by each taxing official to whom any such taxes shall be payable, that all taxes due to be paid said official have been paid for the current year; and if the same be not promptly paid the mortgagee, its legal representatives or assigns may at any time pay the same without waiving or affecting the option to foreclose or any right hereunder, and every payment so made shall bear interest from the date hereof at the rate of Six (6%) per cent per annum; and shall be secured by this mortgage; . . . . ''

When the mortgage was made there were due, and delinquent, taxes against the property mortgaged. The abstracter failed to show this prior lien in the abstract, and the loan was made, the note and mortgage were executed and the proceeds thereof were disbursed in paying a former lien on the property, and obligations of the mortgagors for repairs thereof, together with expenses incidental to making the loan. The existence of the delinquent taxes was not brought to the attention of respondent until the abstract was brought down to date, after the mortgage was placed of record and, as above indicated, after the proceeds thereof had been disbursed. Respondent then demanded that appellants pay the taxes or secure their payment. They refused to do either, or to have anything to do with the matter. In order to preserve the lien of its mortgage, respondent paid the delinquent taxes, amounting to $517.46, and from time to time thereafter, as payments were made to it by appellants, portions thereof were applied toward the reduction of the said sum respondent had paid to discharge the tax lien. With respect to these payments, and the application thereof the trial judge found:

"That the said defendants, from January 22d, 1934, to December 24th, 1934, paid to the plaintiff the sum of $170.80,

of which $29.20 was applied on the principal of said promissory note, and the sum of $141.60 was applied by the plaintiff to interest accrued thereon, leaving a balance on the principal of said indebtedness of $3,368.46.

"That from December 24th, 1934 to June 1st, 1936, the said defendants paid to the plaintiff the sum of $224.13, of which sum $194.24 was applied on the amount advanced by the plaintiff for the payment of delinquent taxes, and the sum of $29.89 was applied on accrued interest on said advancements made for the payment of delinquent taxes."

The trial judge further found that the last payment by appellants to respondent was made May 18, 1936. Another installment of taxes having been permitted by appellants to become delinquent, this suit was commenced December 3, 1936.

██ The only reason given by appellants why they discontinued payments was that some of those made by them had been applied toward the payment to respondent of money paid by it to discharge the lien of the delinquent taxes. As a general rule a debtor, who owes more than one debt to the same creditor and who makes a payment to him, has a right to elect upon which of his obligations his payment shall be applied. Should he not make an election, the creditor may apply the payment toward the extinguishment of any obligation to him of the debtor. (48 C. J., p. 643, sec. 87.) It is said in C. J., vol. 48, p. 644, sec. 88:

"The weight of authority holds that the debtor must direct the application of his payment at or before the time of payment, or at least before the creditor, acting on the debtor's omission, has done so. But even where the creditor has failed to act, the debtor cannot direct application long after payment has been made, or after controversy or litigation has been instituted."

The only evidence that appellants directed how their payments should be applied, whether upon principal and interest or upon their indebtedness to respondent by reason of its having paid the delinquent taxes, is as follows:

"Q. You haven't made any payments on this mortgage indebtedness subsequent to June 18, 1936, have you?

"A. I don't know just the last date. After considerable correspondence with them, and when they had not been applying my payments as directed, that is, on the interest, and told me they were applying them on the principal, shortly after that I quit the payments.

Mr. TWEEDY: "On taxes, you mean.

"A. Taxes, yes—they were applying them on taxes and not interest."

There was also introduced an exhibit, being a carbon copy of an undated letter to Home Owners' Loan Corporation, 444 California Street, San Francisco, California, which the record shows was written by Mr. Stookey, containing a statement as follows:

"Herewith I am enclosing my check for the sum of $14.15 (No. 143) which I ask and request be credited on the principal sum due for the interest for January, 1936."

■ There is no evidence that appellants directed how their payments were to be applied, except the one of $14.15 above mentioned, nor has it been shown that payment was not applied as directed. The evidence fails to establish appellants' contention that their payments were applied in violation of their directions.

■ One of the terms of the mortgage was that appellants agreed to pay all taxes existing against the property at the time of its execution. That agreement was breached, as was also the promise to pay the installments specified in the note. These failures on appellants' part justified respondent in declaring the entire debt to be immediately due, and in foreclosing the mortgage.

■ Appellants argue that the mortgage did not require them to pay delinquent taxes, and they point out, as ground for this contention, that their obligation, in the mortgage expressed, is to pay and discharge *"before maturity* all taxes, assessments, levies, liabilities, obligations or other encumbrances, now subsisting or hereafter laid or imposed upon said property." This contention is unsound. The words "before maturity" can have no application to the payment of taxes on real property in Idaho. Such taxes cannot be

paid before maturity. They may be and should be paid before delinquency. Sec. 61–1002 contains the following:

"All taxes extended on the real property assessment roll shall be payable to the tax collector without penalty on and after the fourth Monday of November in the year in which such taxes are levied, and prior to the fourth Monday of December next thereafter; and all such taxes which have not been paid prior to the fourth Monday of December shall be delinquent, . . . . "

The part of the mortgage now under consideration specifically provides for the payment of taxes *now subsisting or hereafter laid or imposed upon said property*. These words are controlling, and appellants' failure and refusal to pay the delinquent taxes was a violation of the mortgage, and rendered it subject to foreclosure.

 Appellants assign as error the refusal of the trial judge to permit them to prove damages. The loan was so large that, had the delinquent taxes been discovered and added to appellants' indebtedness, it would have made a sum in excess of 80 per cent of the appraised value of their property, which was all respondent was permitted to loan on it. It appears to be appellants' contention that they suffered damage because these delinquent taxes were not added and, therefore, they could not have borrowed money with which to save their property from their creditor, unless he reduced his claim in such amount as would have reduced the indebtedness to not to exceed 80 per cent of the appraised value of the property. In other words, the mistake of the abstracter made it possible for them to borrow money enough to pay their debts against the property, except the delinquent taxes, and because the business was not so conducted that they would have lost the property, or prevailed upon their creditor to accept less than the full amount due him, they claim damages from respondent. This contention appears to be founded on the theory that it was the duty of respondent to bring about a compromise with appellants' creditor and thereby reduce their indebtedness. We can find no basis in the law for such theory.

Appellants contend respondent is a foreign corporation which has not conformed to the laws of Idaho so as to entitle it to transact business in this state and, therefore, this action cannot be maintained.

Respondent is incorporated under the laws of the United States (U. S. C. A., Title 12, sec. 1461 et seq.) Section 1463 provides for the creation of Home Owners' Loan Corporation, and that it shall be an instrumentality of the United States with authority to sue and be sued in any court of competent jurisdiction, federal or state. It is not a foreign corporation within the meaning of I. C. A., sec. 29–501 et seq., requiring foreign corporations, before doing business in this state, to file for record with the secretary of state a certified copy of its articles of incorporation and to do other acts in our statute specified.

It is said in C. J., vol. 14A, p. 1214, sec. 3924:

"A corporation created by an act of congress with powers coextensive with the Union, assuming of course that in creating it congress acts within the scope of its powers, is not a foreign corporation within any state of the Union, any more than an act of congress is a foreign law within any state of the Union. . . . . "

On page 1255, of the same volume, in sec. 3957, this appears:

"Business authorized to be done within a state by constitutional acts of congress cannot.be prohibited or regulated by the state. A corporation created by act of congress as an agency or instrumentality in carrying out the powers vested in congress by the constitution cannot be excluded, restricted, or regulated by a state, and state statutes or constitutional provisions attempting to do so are unconstitutional and void, even with respect to business transactions other than strictly government business, as for example the business of a common carrier conducted by a federal corporation, or the business of banking conducted by a national bank."

See, also, *Twin Falls Nat. Bank v. Reed,* 44 Ida. 573, 258 Pac. 526; *Federal Land Bank of Spokane v. Statelen,* 191 Wash. 155, 70 Pac. (2d) 1053.

The judgment appealed from is affirmed. Costs are awarded to respondent.

Holden, C. J., Budge and Givens, JJ., concur. Ailshie, J., sat with the court at the hearing but does not participate in the decision.