763 P.2d 1052

Robert F. BLANGERS, Patrick R. Bartleson, Robert J. Tully, Walter T. Bartholomew, William M. Richter, Raymond H. Reedy, James H. Weaver and Walter E. Dunlop, Plaintiffs–Appellants, Cross–Respondents,

v.

STATE of Idaho, DEPARTMENT OF REVENUE AND TAXATION, Idaho State Tax Commission, Commissioner Larry G. Looney, Commissioner Carol M. Dick, Commissioner Morgan Munger and Commissioner Darwin L. Young, Commissioners of State Tax Commission, State of Idaho and the State of Idaho, Defendants–Respondents, Cross–Appellants.

No. 16404.

Supreme Court of Idaho.

May 25, 1988.

On Denial of Petition for Rehearing Oct. 28, 1988.

Sims, Liesche & Newell, P.A., Coeur d'Alene, Paine, Hamblen, Coffin, Brooke & Miller, Spokane, Wash., for plaintiffs-appellants, cross-respondents. Wm. Fremming Nielsen argued.

Jim Jones, Atty. Gen., Larry M. Dunn (argued), Deputy Atty. Gen., Boise, for defendants-respondents, cross-appellants.

JOHNSON, Justice.

This is an income tax case. The primary issue is whether the State of Idaho may impose an income tax on nonresident railway employees on nonstop transcontinental freight trains traveling across the panhandle of Idaho. We agree with the conclusion of the trial court that the laws of Idaho require the employees to pay Idaho income tax, but reverse the decision of the trial court upholding the constitutionality of the income tax on the earnings of these nonresident employees. We conclude that the Idaho law imposing a tax on the income of these employees while they are traveling through Idaho violates the due process clause of the fourteenth amendment and the commerce clause (art. I, § 8, cl. 3) of the United States Constitution.

## I.

### Facts

Burlington Northern Railroad Company (BN) a federal land grant railroad, employed engineers, brakemen, firemen and conductors (the train crews), all of whom were residents of the state of Washington and not Idaho residents or domiciliaries. In the course of their employment with BN the train crews occupied nonstop transcontinental freight trains (the trains) traveling between Spokane, Washington, and Whitefish or Missoula, Montana, and back to Spokane. The mileage and time spent in Idaho constituted less than fifty percent of the total mileage and time of each of the members of the train crews while they were employed by BN.

The trains were "through" trains that did not perform any switching in Idaho. The trains made no scheduled stops in Idaho. Orders directing the trains came from outside the borders of Idaho. There were no crew changes within Idaho. The train crews neither reported for work nor were they dismissed in Idaho.

In the spring of 1983, the train crews received written notice from the Idaho State Tax Commission (the Commission) that they were subject to Idaho income tax. The notice indicated that all taxes due for years prior to 1978 would be waived and no penalties imposed, if they filed returns for the years 1978 through 1982 and paid the income taxes before August 1, 1983.

A class action lawsuit was filed on behalf of the train crews seeking declaratory judgment determining whether the compensation earned while they were traveling through Idaho was subject to Idaho income tax and whether the application of the Idaho income tax statutes to these earning violated provisions of the Idaho Constitution and the United States Constitution.

The parties stipulated to the facts of the case. The trial court ruled that the train crews were subject to Idaho income tax for income earned by them while employed on trains traveling through the state, that the imposition of the tax did not violate provisions of either the Idaho Constitution or the United States Constitution, but that the statute of limitations barred the Commission from imposing a tax prior to 1980.

The train crews appealed the declaratory judgment of the trial court. The Commission cross-appealed the trial court's decision that the statute of limitations prevented the Commission from assessing any tax against the train crews for any period prior to 1980.

## II.

The Idaho Income Tax Statutes Apply to the Compensation of the Train Crews While Employed on Trains Traveling Through the State of Idaho

In 1959 the Idaho Legislature declared its intent "to impose a tax on ... the income of nonresidents which is the result of activity within or derived from sources within this state." I.C. § 63-3002. This intent has remained unchanged to date and was implemented by a provision imposing a tax "upon that part of the taxable income of any nonresident individual ... derived from sources within the state of Idaho."

I.C. § 63-3024. In 1965 this Court held that a nonresident railroad employee who was employed on a train that made a daily run from a town within Idaho to a town outside Idaho was required to pay income tax on that portion of his income that was allocated to the miles the train traveled in Idaho. *Gee v. West*, 90 Idaho 173, 409 P.2d 116 (1965). The train crews contend that in 1965 the Idaho Legislature changed the theory of taxation for nonresidents to a "base of operations" theory. They argue that under this theory, a nonresident is taxed only if the nonresident has a base of operations in the state. For support they cite a concurring opinion in *Gee*. This contention is not sustained by the Idaho income tax statutes that have been in effect at times pertinent to this case.

From 1976 until 1986 I.C. § 63-3024 imposed a tax "upon that part of the taxable income of any nonresident individual ... derived from sources within the state of Idaho as set forth in section 63-3027A, Idaho Code." In 1986 the words "as set forth in section 63-3027A" were changed to "computed as required by section 63-3027A." 1986 Idaho Sess. Laws, ch. 90, pp. 262, 267. Despite periodic amendments by the legislature of I.C. § 63-3027A since 1976, this statute has continued to provide for the determination of the taxable income of a part-year or nonresident individual. The contention of the train crews that I.C. § 63-3027A has failed to set forth a means of determining what portion of the income of a nonresident is derived from sources within the state of Idaho is fallacious. The purpose of the reference in I.C. § 63-3024 to I.C. § 63-3027A was to provide for a means of computing taxable income, not to determine what portion of the gross income of a nonresident was derived from sources within the state of Idaho.

█ The portion of the income of a nonresident "derived from sources within the state of Idaho" must be determined by reference to the decisions of this Court in *Barraclough v. State Tax Commission*, 75 Idaho 4, 266 P.2d 371 (1954) and *Gee*. These decisions established that where compensation for personal services is in-

volved, the source of income is the location where the services are performed. Therefore, applying the statutes and this Court's rulings in *Barraclough* and *Gee* concerning the source of income for personal services, the compensation of the train crews for the services performed while they pass through Idaho are within the coverage of the Idaho income tax laws.

■ The regulations of the Commission have been consistent with this result. The challenge of the train crews that these regulations have violated the uniformity requirement of art. 7, § 5 of the Idaho Constitution is not valid. That section applies only to *ad valorem* taxes. *Johnson v. Diefendorf,* 56 Idaho 620, 627, 57 P.2d 1068, 1071 (1936).

Because of our decision, *infra,* declaring that the application of the Idaho income tax statutes to the income of the train crews while traveling through Idaho is unconstitutional, we do not consider the question of the applicable statute of limitations.

### III.

There Is Not A Sufficient Nexus To Sustain Taxation of the Compensation of the Train Crews While Traveling Through Idaho

The train crews contend that their presence in Idaho while traveling on the transcontinental trains is not a sufficient nexus under the due process clause of the fourteenth amendment and the commerce clause of the Constitution of the United States to allow Idaho to subject the compensation they earn while traveling through Idaho to state income taxes. We agree.

The United States Supreme Court has held that "just as a state may impose general income taxes upon its own citizens and residents whose persons are subject to its control, it may, as a necessary consequence, levy a duty of like character, and not more onerous in its effect, upon incomes accruing to nonresidents from their property or business within the state, or their occupations carried on therein." *Shaffer v. Carter,* 252 U.S. 37, 52, 40 S.Ct.

221, 225, 64 L.Ed. 445 (1920). There the Court upheld an Oklahoma income tax on an Illinois resident who had engaged in the oil business in Oklahoma "having purchased, owned, developed and operated a number of oil and gas mining leases, and being the owner in fee of certain oil-producing land, in that state." *Id.* at 45, 40 S.Ct. at 223. The Court held that the Oklahoma tax was valid under both the due process clause of the fourteenth amendment and the commerce clause. On the same day that *Shaffer* was decided by the Supreme Court, the Court also issued its opinion in *Travis v. Yale & Towne Manufacturing Co.,* 252 U.S. 60, 40 S.Ct. 228, 64 L.Ed. 460 (1920), sustaining the validity of a New York net income tax imposed on a business, trade, profession or occupation carried on in New York by nonresidents. In *Travis* the Court upheld the tax against a challenge based on the due process clause of the fourteenth amendment. No challenge was presented before the Supreme Court on the basis of the commerce clause. *Id.* at 75–76, 40 S.Ct. at 230.

The leading case on the taxation of the personal income of nonresidents by a state since *Shaffer* and *Travis* is *American Commuters Association, Inc. v. Levitt,* 405 F.2d 1148 (2nd Cir.1969). There the Second Circuit upheld the validity of New York state and city laws imposing income taxes on nonresidents who were employed in the city of New York, although they lived in New Jersey and Connecticut and commuted to New York for their work. One of the challenges made by the nonresident commuters to the New York income taxes was under the due process clause of the fourteenth amendment. The Second Circuit cited both *Shaffer* and *Travis* in support of its conclusion that the New York tax on the personal income of nonresidents did not run afoul of the due process clause. *Id.* at 1152. The Court pointed out that the nonresident commuters had "admitted that they receive earned income in New York and already receive the substantial benefit of being able to do business there, a benefit valuable enough to them so that they suffer the ills of commuting in

order to obtain it." *Id.* at 1153. The Court then pointed out:

> While so doing business and acquiring personal income thereby, state and city furnish the non-resident commuting worker all the general services furnished residents, such as police and fire protection. The test controlling this case is the test laid down by the Supreme Court in *Wisconsin v. J.C. Penney*, [311 U.S. 435, 61 S.Ct. 246, 85 L.Ed. 267 (1940)], where the Court said: "the simple but controlling question is whether the state [or City] has given anything for which it can ask return." 311 U.S. at 444, 61 S.Ct. at 250. It is unnecessary further to point out that this test has been adequately met.

*Id.*

■ Since *Shaffer* and *Travis* there has been a plethora of cases decided by the Supreme Court concerning the standards to be applied under the due process clause of the fourteenth amendment and the commerce clause in determining the constitutionality of various other types of taxes imposed by the states on nonresident individuals and corporations. For our purposes in this case, the most significant evolution that has occurred in the decisions of the Supreme Court is the development of the requirement that there be a sufficient nexus between the presence, property or activities of the nonresident and the state attempting to impose the tax in order to survive a challenge under the due process clause or the commerce clause. This evolution culminated in two decisions of the Supreme Court in 1977. *Complete Auto Transit, Inc. v. Brady*, 430 U.S. 274, 97 S.Ct. 1076, 51 L.Ed.2d 326 (1977) and *National Geographic Society v. California Board of Equalization*, 430 U.S. 551, 97 S.Ct. 1386, 51 L.Ed.2d 631 (1977). In both of these cases the Court synthesized its prior rulings to announce that nexus is a prerequisite before a state may impose a tax on a nonresident. *Complete Auto*, 430 U.S. at 279, 97 S.Ct. at 1079; *National Geographic*, 430 U.S. at 556, 97 S.Ct. at 1390. In both cases the Court cited as authority four cases decided by the Court during the period from 1940 through 1964

in support of the nexus requirement. These cases were *Wisconsin v. J.C. Penney Co.*, 311 U.S. 435, 61 S.Ct. 246, 85 L.Ed. 267 (1940), *Memphis Gas Co. v. Stone*, 335 U.S. 80, 68 S.Ct. 1475, 92 L.Ed. 1832 (1948), *Northwestern Cement Co. v. Minnesota*, 358 U.S. 450, 79 S.Ct. 357, 3 L.Ed.2d 421 (1959), and *General Motors Corp. v. Washington*, 377 U.S. 436, 84 S.Ct. 1564, 12 L.Ed.2d 430 (1964). An examination of the development of the concept of nexus in these cases and in *Complete Auto*, and *National Geographic* leads us to our conclusion in this case.

In *J.C. Penney Co.* the Court began to formulate the nexus requirement by stating:

> A state is free to pursue its own fiscal policies, unembarrassed by the Constitution, if by the practical operation of a tax the state has exerted its power in relation to opportunities which it has given, to protection which it has afforded, to benefits which it has conferred by the fact of being an orderly, civilized society.
>
> Constitutional provisions are often so glossed over with commentary that imperceptibly we tend to construe the commentary rather than the text. We cannot, however, be too often reminded that the limits on the otherwise autonomous powers of the states are those in the Constitution and not verbal weapons imported into it. "Taxable event," "jurisdiction to tax," "business situs," "extraterritoriality," are all compendious ways of implying the impotence of state power because state power has nothing on which to operate. These tags are not instruments of adjudication but statements of result in applying the sole constitutional test for a case like the present one. That test is whether property was taken without due process of law, or, if paraphrase we must, whether the taxing power exerted by the state bears fiscal relation to protection, opportunities and benefits given by the state. The simple but controlling question is whether the state has given anything for which it can ask return.

311 U.S. at 444, 61 S.Ct. at 250.

In applying this formulation the Court upheld a Wisconsin general corporate income

tax on earnings of corporations chartered by other states when the earnings were attributable to the Wisconsin activities of the corporation. The Court pointed out that "the incidence of the tax as well as its measure is tied to the earnings which the State of Wisconsin has made possible, insofar as government is the prerequisite for the fruits of civilization...." *Id.* at 446, 61 S.Ct. at 250. The Court found acceptable the application of the Wisconsin tax as applied to dividends declared by foreign corporations in other states out of income derived from property located and business transacted in Wisconsin.

In *Memphis Natural Gas Co.* the Court disposed of any due process claim by stating succinctly that the gas company's property was "in the taxing state where the taxable incidents occurred." 335 U.S. at 86, 68 S.Ct. at 1482. With regard to the commerce clause, the Court considered whether Mississippi could impose a franchise or excise tax on the capital used, invested or employed in the exercise of any power, privilege or right enjoyed by a corporation within the state. Concerning what is now denominated as the nexus standard, the Court stated that the question was whether the tax could be imposed where the activities of the gas company in the state were the maintenance, repair and manning of an interstate gas pipeline. The Court focused on "whether these activities are so much a part of the interstate business as to be under the protection of the Commerce Clause as this Court has construed it." *Id.* at 93, 68 S.Ct. at 1482. The Court concluded:

> We think that the State is within its constitutional rights in exacting compensation under this statute for the protection it affords the activities within its borders. Of course, the interstate commerce could not be conducted without these local activities. But that fact is not conclusive. These are events apart from the flow of commerce. This is a tax on activities for which the state, not the United States, gives protection and the state is entitled to compensation when its tax cannot be said to be an unreasonable

burden or a toll on the interstate business.

*Id.* at 96, 68 S.Ct. at 1483.

In *Northwestern States Portland Cement Company* the Court upheld under both the commerce clause and the due process clause net income taxes imposed by Minnesota and Georgia on that portion of a foreign corporation's net income earned from and fairly apportioned to business activities within each state, even though those activities were exclusively in furtherance of interstate commerce. The Court found that the corporations which had challenged the tax were "sufficiently involved in local events to forge 'some definite link, some minimum connection' sufficient to satisfy due process requirements." 358 U.S. at 465, 79 S.Ct. at 366. (Citation omitted.) The Court found that the corporations engaged in "substantial income-producing activity" in Minnesota and Georgia. *Id.* In the Minnesota case the Court found that almost half of the corporation's income was derived from sales in the state that were shown to be promoted by "vigorous and continuous sales campaigns run through a central office located in the State." *Id.* With regard to the activities of the corporation in Georgia, the Court stated that while the percent of sales was not available "the course of conduct was largely identical" to that of the corporation in Minnesota. *Id.*

In *General Motors* the Court considered the constitutional validity under the commerce clause and the due process clause of a Washington tax imposed on the privilege of engaging in business activities within the state measured by gross wholesale sales of motor vehicles, parts and accessories delivered in the state by General Motors. The Court pointed out that it had decided a long line of cases "holding that an in-state activity may be a sufficient local incident upon which a tax may be based." 377 U.S. at 447, 84 S.Ct. at 1571. The Court focused on the fact that the divisions of General Motors had district managers, service representatives and other employees who were residents of Washington and who performed substantial services in relation to functions of the company in the

state, "particularly with relation to the establishment and maintenance of sales, upon which the tax was measured." *Id.* In formulating the standard to be used in determining the validity of the tax, the Court stated that it must determine whether there was " 'some definite link, some minimum connection, between a state and the person, property or transaction it seeks to tax.' *Miller Bros. Co. v. Maryland,* 347 U.S. 340, 344–345 [74 S.Ct. 535, 539, 98 L.Ed. 744 (1954).]" *Id.* at 448, 84 S.Ct. at 1571. In upholding the tax the Court observed:

> Although mere entry into a State does not take from a corporation the right to continue to do an interstate business with tax immunity, it does not follow that the corporation can channel its operations through such a maze of local connections as does General Motors, and take advantage of its gain on domesticity, and still maintain the same degree of immunity.

*Id.*

In *Complete Auto* after a discussion of the nexus requirement and other standards to be utilized in commerce clause cases involving the taxation of nonresidents, the Court pointed out that "no claim is made that the activity is not sufficiently connected to the State to justify a tax." 430 U.S. at 287, 97 S.Ct. at 1083. The facts there indicated that General Motors assembled vehicles outside the state of Mississippi that were delivered to dealers in Mississippi. The vehicles were shipped by rail to Jackson, Mississippi, where they were loaded onto trucks and transported to the Mississippi dealers by a Michigan corporation that was paid on a contract basis for the transportation from the railhead to the dealers. The Court upheld sales taxes assessed against the Michigan corporation for sales of transportation services in Mississippi.

In *National Geographic* the Court affirmed a California Supreme Court decision upholding the imposition upon National Geographic of a use-tax-collection liability measured by mail-order sales of merchandise to customers in California from the District of Columbia and Maryland. National Geographic had maintained offices in San Francisco and Los Angeles since 1956. Each office was originally staffed with one salesman and one secretary. Each office subsequently increased its personnel to four. The basic function of the offices was to solicit advertising for the magazine published by National Geographic. Sales of advertising copy by the two offices aggregated about $1 million annually. 430 U.S. at 554 n. 2, 97 S.Ct. at 1389 n. 2. The Court stated that the question presented by the case was "whether the Society's activities at the offices in California provided sufficient nexus between the out-of-state seller appellant and the State—as required by the Due Process Clause of the Fourteenth Amendment and the Commerce Clause—to support the imposition upon the Society of a use-tax-collection liability." *Id.* at 554, 97 S.Ct. at 1389. The Court rejected the rationale of the California Supreme Court that the " 'slightest presence' " within a taxing state " 'independent of any connection through interstate commerce' " would permit a state constitutionally to impose the duty of collecting the use tax generated from mail order purchasers. *Id.* at 556, 97 S.Ct. at 1390. The Court pointed out that National Geographic's maintenance of two offices in California and solicitation by employees assigned to those offices of advertising copy in the range of $1 million annually "establish a more substantial presence than the expression 'slightest presence' connotes." *Id.* The Court held that National Geographic's "maintenance of two offices in California and activities there adequately establish a relationship or 'nexus' between the Society and the State that renders constitutional the obligations imposed" upon National Geographic. *Id.*

Recent decisions of the Supreme Court confirm that the formulation of the requirement of nexus that culminated in *Complete Auto* and *National Geographic* continues to be the standard applied by the Court. *E.g., Tyler Pipe Industries, Inc. v. Washington Department of Revenue,* 483 U.S. 232, 107 S.Ct. 2810, 97 L.Ed.2d 199 (1987). In *Tyler* the Court cited *National Geo-*

*graphic* and agreed that there was a sufficient nexus to impose a tax on an out-of-state manufacturer where the manufacturer's sales representatives performed activities in Washington necessary for the maintenance of the manufacturer's market and protection of its interests in Washington. The Court concurred with the determination of the Washington Supreme Court that "'the crucial factor governing nexus is whether the activities performed in this state on behalf of the taxpayer are significantly associated with the taxpayer's ability to establish and maintain a market in this state for the sales.'" *Id.* 107 S.Ct. at 2822, *quoting* 105 Wash.2d 318, 715 P.2d 123, 129 (1986).

With these authorities in mind, the question in this case is whether the presence of the train crews in Idaho while traveling through on transcontinental trains that make no scheduled stops is sufficient under the due process clause of the fourteenth amendment and the commerce clause to establish the requisite nexus for imposing an income tax on the compensation earned by the train crews during that time.

The train crews correctly point out that their wages while traveling through Idaho are not attributable to any economic activity within Idaho, and that Idaho markets and commerce do not affect their income in any degree. They are present in Idaho only by virtue of the fact that the train on which they are employed must necessarily traverse the panhandle of this state while moving from Washington to Montana or *vice versa.* Their mere presence here does not provide the nexus necessary to allow Idaho to tax the income they earn while in transit through the state.

While the Idaho income tax statutes and the decisions of this Court in *Barraclough* and *Gee* indicate that for statutory purposes, Idaho is the source of the compensation of the train crews while they are traveling through Idaho, in the sense of the due process clause and the commerce clause, Idaho is not the source of this income, since there is no contribution by Idaho to the production of this income. It would be unfair to allow the state to impose a tax on the income of the train crews earned while they are merely passing through Idaho.

Our decision is consistent with the decision of the Supreme Court of Washington in *State of Alaska v. Petronia,* 69 Wash.2d 460, 418 P.2d 755 (1966). In that case the Washington Supreme Court upheld an income tax by the state of Alaska on the earnings of seamen while the vessels upon which the seamen were working were within Alaska's boundaries. The court pointed out the importance of the economic activity generated by the state of Alaska in determining that the contacts of the seamen with Alaska were sufficient to fulfill the nexus requirement:

> Probably the most significant benefits in the eyes of these defendant seamen are the wages they contemplated receiving for their services during the course of the vessel's voyage. The business productivity generated by Alaska was accountable for the wages earned by the defendants when they were in Alaskan waters.... We are satisfied that the benefits of employment afforded by this economic activity of the state of Alaska constituted minimum connections within the rule to avoid a denial of due process under the Fourteenth Amendment to the United States Constitution.

418 P.2d at 758–59.

Merely because the train crews were on the payroll of BN while in transit through Idaho is not a sufficient basis under the due process clause to justify imposing an income tax on these earnings. No business productivity generated by Idaho was accountable for the wages earned by the train crews when they were in Idaho. In addition, using the ultimate test enunciated by the Supreme Court in *J.C. Penney Co.* Idaho has not given anything to the train crews for which it can ask return. Here, there is no showing that the presence of the train crews in Idaho cause the state, in the words of the Court in *J.C. Penney Co.,* to give "anything for which it can ask return." 311 U.S. at 444, 61 S.Ct. at 250. It is BN, not the train crews, to which the state has given anything for which it can

ask return. The train crews do not owe their livelihood to Idaho, but rather to their employment by BN, which transports them through Idaho without stop in the course of their employment.

If the due process clause allows Idaho to tax the income earned by the train crews while in Idaho, then we must be prepared to sustain taxes on the income earned by any person who crosses Idaho by any means without stopping or transacting business here, but who is being compensated while in transit. We are not prepared to say that the constitution permits taxation by the state in this fashion. There is not a sufficient nexus to allow such a tax under either the due process clause or the commerce clause.

### IV.

### Conclusion

The declaratory judgment of the trial court is reversed.

Costs to appellants.

No attorney fees on appeal.

BAKES, J., concurs.

SHEPARD, C.J., concurs in result.

HUNTLEY, Justice, dissenting.

The majority opinion today is one of the most disruptive decisions ever to emanate from this bench. It is an opinion totally unsupported by the most basic of legal and taxation principles. It is a decision founded upon no precedent from Idaho or any other jurisdiction in this nation. The majority, perhaps due to a knee-jerk reaction against the imposition of any tax whatsoever, has misinterpreted the law and hatched an unsound analysis leading to the establishment of an incorrect concept of the application of the term nexus to income tax cases.

This case presents a single simple issue, the positing of which suggests the answer to all who do not permit their reasoning processes to become clouded by complex legalese and other profundities:

May a state impose an income tax on nonresidents working within the boundaries of the state?

The answer:

(1) The power of Idaho to levy income taxes upon those who work in the state is permitted under both the United States Constitution and the Idaho Constitution.

(2) Not one single recognized case authority from any court in this nation holds this tax on the railroaders improper or unconstitutional.

The plaintiff railroaders work in three states as they make their daily run: Washington, Idaho, and Montana. Some earn as much as 36% of their income, that is more than $20,000 per year, while within the Idaho segment.

The Idaho statutory scheme imposes tax on the income of nonresidents derived from sources within Idaho. I.C. § 63–3002 provides: "**Declaration of intent.**—It is the intent of the legislature ... to impose a tax on ... the income of nonresidents which is the result of activity within or derived from sources within this state." I.C. § 63–3024 mirrors I.C. § 63–3002 and requires a nonresident taxpayer earning income from Idaho sources to file a state tax return.[1] "Sources" has been defined by this Court:

The word "sources" when used in statutes dealing with sources of income as compensation for personal services has reference not to the person or entity paying for the services, but to the location where the services are performed. It is generally held that if the income is compensation for labor or services, the *place where the labor is performed or services rendered is decisive as being*

---

1. I.C. § 63–3024 states in pertinent part:

   **63–3024. Individuals' tax and tax on estates and trusts.**—A tax is hereby imposed for each taxable year commencing on and after January 1, 1987, upon every resident individual, trust or estate which shall be measured by his or its taxable income, and upon that part of the taxable income of any nonresident individual, trust or estate derived from sources within the state of Idaho computed as required by section 63–3027A, Idaho Code.

*the source of income.* (Citations omitted.) (Emphasis added.)

*Barraclough v. State Tax Commission,* 75 Idaho 4, 10, 266 P.2d 371, 374–375 (1954). For a similar interpretation of the Internal Revenue Code, *see, Motors Insurance Corporation v. United States,* 530 F.2d 864, 876, 208 Ct.Cl. 571 (1976).

The *Barraclough* holding was reinforced in *Gee v. West,* 90 Idaho 173, 409 P.2d 116 (1955), where we held the Idaho taxing scheme only allowed for the imposition of a state income tax on the income earned in Idaho by a nonresident. The taxpayer in *Gee* resided in Washington, and worked on a train which began and ended its daily run in Idaho, but for the greater part of the run traversed through Washington. The tax commission attempted to impose a tax on all of the taxpayer's earnings arguing that he had a business situs in Idaho. We ruled that business situs was irrelevant because "the intent of the Legislature was to tax only the amount of income a nonresident received as compensation for labor or personal services performed in Idaho and derived from Idaho sources" *Id.* at 178, 409 P.2d at 118. A proper interpretation of the statutory scheme required an allocation of the taxpayer's income between Idaho and Washington based upon the respective mileage and time spent in each state.

To impose an Idaho income tax on the Burlington Northern employees is not contrary to the taxing statutes. The word "sources" has been defined in a territorial sense, and as such, any income earned within the boundaries of the state of Idaho by a nonresident triggers the application of I.C. § 63–3024. *See also, Futura v. State Tax Commission,* 92 Idaho 288, 442 P.2d 174 (1968) (the word "sources" when used in statutes dealing with dividend income from nonqualifying corporation has reference not to the location of entities issuing or receiving the dividend, but rather to

location of business activities wherein the earnings were derived.)

In a similar action brought in Montana, this same class of railroaders recently *stipulated* to a judgment that income earned while rolling over the tracks in Montana is subject to Montana income tax.[2] Is a determination of the absence of "nexus" based upon the distinction that the trail "rolls and stops" in Montana while it only "rolls" in Idaho an exercise in judicial craftsmanship or resultsmanship?

As the majority notes, the power of a state legislature to tax the income of nonresidents was affirmed by the United States Supreme Court in 1920 in *Shaffer v. Carter,* 252 U.S. 37, 40 S.Ct. 221, and *Travis v. Yale & Towne Manufacturing Co.,* 252 U.S. 60, 40 S.Ct. 228. *Shaffer* and *Travis* remain the law today and when one reads the majority opinion referring thereto, one would expect the case to be affirmed because it is conceded by all that the extent to which there will be any exemption to taxation is a matter of legislative, not judicial, policy. Not so—as the majority later proceeds to a strained and tortured definition of "nexus" to forge a different result.

The majority next cites to *American Commuters Association v. Levitt,* 405 F.2d 1148 (2nd Cir.1969) wherein state and city income taxes imposed by New York on New Jersey and Connecticut residents were upheld on the basis that New York provides general services such as fire and police protection to those residents. Since neither Montana nor Washington provide fire and police protection for our train as it proceeds through Idaho, one might think that *Levitt, supra,* decides the issue in favor of affirmance. Not so—as our majority tortures the concept of "nexus" to escape *Shaffer, Travis* and *Levitt.*

The majority next cites to *J.C. Penney Co.,* 311 U.S. 435, 61 S.Ct. 246, 85 L.Ed. 267 (1940), to ascertain the meaning of nexus:

---

**2.** A copy of the Montana Court order is attached hereto as Appendix A. Unfortunately, the Attorney General did not bring this case to our attention and the railroad attorney professed no knowledge of it at our initial oral argument. The lack of forceful advocacy by the attorneys

for the State in failing to present and argue the implications of the Montana stipulation, and in failing to present to this Court the broader ramifications of the result reached by the majority herein, is most disturbing.

A state is free to pursue its own fiscal policies, unembarrassed by the Constitution, if by the practical operation of a tax the state has exerted its power in relation to opportunities which it has given, to protection which it has afforded, to benefits which it has conferred by the fact of being an orderly, civilized society.

Again, as our train traverses Idaho, are those benefits, protections, and opportunities being provided by Washington, Idaho, or Montana; or are the employees in *no state at all* for income tax purposes because wheels and tracks magically separate them from both *terra firma* and the Idaho Income Tax?

If one of the train crew were to be mugged by a passenger, would the "nexus" for criminal law purposes be in Washington, from whence the train was dispatched; or in Montana, where the wheels might later stop rolling; or in Idaho, where that act was committed? But was not the act of earning the money herein done in Idaho? Is nexus to be defined differently because we cherish law and order and disdain taxes?

The majority summarizes *J.C. Penney Co., supra,* in part with the following sentence:

In applying this formulation the Court upheld a Wisconsin general corporate income tax on earnings of corporations chartered by other states when the *earnings were attributable to the Wisconsin activities of the corporation.* (Emphasis added).

Were not the earnings of our train crew attributable to activities in Idaho?

Now please reread the majority's cogent discussion at page 949, 763 P.2d at 1057 of *Memphis Natural Gas Co. v. Stone,* 335 U.S. 80, 68 S.Ct. 1475, 92 L.Ed. 1832 (1948) and wager a guess at which result that case would take us to if you didn't know the majority's ultimate conclusion?

Next, at page 949, 763 P.2d at 1057, the majority cogently discusses *Northwestern Cement Co. v. Minnesota,* 358 U.S. 450, 79 S.Ct. 357, 3 L.Ed.2d 421 (1959) in a way which would lead one to think they were

about to affirm the tax commission herein—not so.

The majority next notes that in *General Motors Corp. v. Washington,* 377 U.S. 436, 84 S.Ct. 1564, 12 L.Ed.2d 430 (1964):

The Court pointed out that it had decided a long line of cases "holding that an in-state activity may be a sufficient local incident upon which a tax may be used."

If the *activity* of our trainmen was not in Idaho when the train was in Idaho, where was it—in the great Sovereign State of Suspension?

Discussing *General Motors* further our majority states:

In formulating the standard to be used in determining the validity of the tax, the Court stated that it must determine whether there was "some definite line, *some minimum connection,* between a state and the person, property or transaction it seeks to tax." *Miller Bros. Co. v. Maryland,* 347 U.S. 340, 344–45, 74 S.Ct. 535, 539, 98 L.Ed. 744 (1954).

Why does the majority deny that at least "some *minimum* connection" exists between Idaho and our trainmen's earning of income? Were the Idaho panhandle mileage not interposed between Washington and Montana, would not the hours of work and the monthly compensation be less for operating from Spokane to Missoula and back?

Since the *General Motors* court held that "some minimum connection was enough nexus to support the imposition of a tax, would the majority here have us believe that the contact of the trainmen is to be quantified as something even *less than* minimum. If so, what is the descriptive adjective?"

The majority next takes one paragraph each to discuss *Complete Auto Transit Inc. v. Brady,* 430 U.S. 274, 97 S.Ct. 1076, 51 L.Ed.2d 326 (1977) and *National Geographic Society v. California Board of Equalization,* 430 U.S. 551, 97 S.Ct. 1386, 51 L.Ed.2d 631, both of which *sustain* the taxing powers, and reasons therefrom that by *sustaining* the power to tax, those cases stand for the proposition Idaho has

no power to tax. I find the majority's reasoning process unfathomable at best.

The majority also notes that the U.S. Supreme Court, while finding that the *slightest presence* in the state was not enough to support taxing power, nevertheless held National Geographic had a "more substantial presence [in California] than the expression 'slightest presence' connotes." The Court did not define or describe what a "slightest presence" resembles. However, it is doubtful from reading the text of *National Geographic* that the Supreme Court would hold that total, complete, absolute physical presence of a train crew within Idaho is *"less* than 'more substantial than slightest.'"  In fact, a person schooled neither in law nor logic might observe that a human being is either in Idaho or out of Idaho while working, leaving the term "slightest presence" to only describe that condition where only one's big toe is inside the boundary.

The next to final case cited by the majority is *Tyler Pipe Industries, Inc. v. Washington Department of Revenue*, 483 U.S. 232, 107 S.Ct. 2810, 97 L.Ed.2d 199 (1987), which *sustained* the tax on an out-of-state manufacturer because it had a sales representative in the state. How is *Tyler* authority for the majority's result? One might suggest that if *Tyler* imposes the tax on the non-present corporation because of the agent being within the state, one should reason that if the person's presence provides nexus over the corporation, the person's presence also provides nexus over the person which provides the nexus for the corporation.

This dissent, to this point, has discussed most of the cases cited through page 951, 763 P.2d at 1059 of the fourteen and one-half page majority opinion. The majority has cited eleven cases, all of which *sustain* taxing power under various degrees and types of contact, and none of which hold against the finding of nexus; the majority then concludes that there is no nexus here to require a wage-earner to pay taxes on income earned while physically working in Idaho. Some judicial magic!!

One might wonder why neither the appellants nor the majority have been able to find a single case on point which holds against the presence of nexus in a case like this, despite all the history of income taxation throughout this nation. Perhaps it is because most lawyers and all other courts have read Webster's definition of nexus: "Connection; interconnection; tie; link." While these trainmen are working in Idaho, are they not more physically connected to this state than any other?

Finally, the majority cites *State of Alaska v. Petronia*, 69 Wash.2d 460, 418 P.2d 755 (1966), another case *sustaining* (not rejecting) the taxing power. In *Petronia*, the Washington Supreme Court was faced with a case involving circumstances similar to those in the present case. At issue was whether the State of Alaska could constitutionally levy a tax on the net income of seamen engaged in interstate and foreign commerce, where the tax was levied only on that portion of their net income which was attributable to their activity within the boundaries of Alaska. (418 P.2d 757). Like the trainmen, the seamen in *Petronia* argued that virtually all the benefits afforded them by Alaska were *de minimus*, and that virtually all the protection normally afforded by a state to a nonresident employee was afforded to them exclusively by the federal government. The seamen went on to argue that virtually the only benefits available to them from the State of Alaska were the protections and benefits they were afforded by the state when they were on shore in a strictly tourist or recreational capacity.

The Washington court was not persuaded by the arguments of its own residents. Ruling in favor of the State of Alaska, the Court held:

> We find no distinction between the business generated by the economic activities of Alaska accountable for the employment of nonresidents, whether it be on land or on the water within Alaskan boundaries. We are satisfied that the benefits of employment afforded by this economic activity of the state of Alaska constituted minimum connections within the rule to avoid a denial of due process

under the 14th amendment to the United States Constitution.

418 P.2d at 759. Similar constitutional claims were rejected in *Alaska Steamship Co. v. Mullaney,* 180 F.2d 805 (9th Cir. 1950), and *Sjong v. State of Alaska,* 622 P.2d 967 (Alaska 1981).

In its Memorandum Opinion, the trial court herein noted that while working in Idaho, the trainmen are provided many benefits and protections by Idaho's state and local governmental structures. It is these protections which provide the trainmen the opportunity to exercise their intelligence, skill and labor while performing work for their employer within Idaho. In addition, it is these same protections, i.e., the "fruits of civilization," which make it possible for Burlington Northern to operate its trains in Idaho, thus giving rise to the employment of Burlington Northern employees.

Burlington Northern employees attempt to dismiss the value of these services by asserting simply that they receive no more benefits than tourists who visit the state in a recreational capacity. The flawed reasoning underlying this argument becomes obvious when it is carried out to its logical conclusion. If the state must show that it provides the nonresident worker with benefits greater than those it provides tourists, it is unlikely that any nonresident employees within Idaho would be subject to income tax. It is the notion that the benefits afforded to the taxpayer by the state are related to the generation of income which provides the basis for the income tax. *See, Sjong v. State Department of Revenue,* 622 P.2d at 970–971. There is no requirement that the state must provide nonresident taxpayers exactly the same benefits and opportunities provided to its residents. *American Commuters Association v. Levitt,* 279 F.Supp. 40 (S.D.N.Y.1967), aff'd, 405 F.2d 1148, 1153 (2nd Cir.1969).

The only distinction between the employees in *Petronia* and the Burlington Northern employees here is that in *Petronia,* the ship stopped in Alaskan ports, whereas here, the trains make no stops in Idaho. However, the seamen performed no work related tasks while on shore. Their duties were limited to operating the vessels while at sea. The distinction is really one without a purpose. Both groups of employees are compensated for work performed while aboard a moving object. The real benefit received by both groups is the opportunity to earn income within the respective states' borders. Perhaps *Petronia* and the instant case can be distinguished because ocean waters and railroad roadbeds have different specific gravities.

In short, the majority opinion proposes that total and complete physical presence within a state constitutes zero nexus. I have troubled to write because of the serious implications which will follow as to other cases if the rule of this case is taken seriously in the future.

Bearing in mind that income tax is levied, not upon where one sleeps or goes to church, but rather upon the taxable event of earning income within a jurisdiction, does the distinction that Wyoming trainmen who roll on Union Pacific tracks and wheels in southern Idaho make one Idaho stop, justify taxing them while Burlington Northern trainmen go tax free?

The majority opinion closes with the following inaccurate assessment of the state of affairs:

> If the due process clause allows Idaho to tax the income earned by the train crews while in Idaho, then we must be prepared to sustain taxes on the income earned by any person who crosses Idaho by any means without stopping or transacting business here, but who is being compensated while in transit. We are not prepared to say that the constitution permits taxation by the state in this fashion. There is not sufficient nexus to allow such a tax under either the due process clause or the commerce clause.

The silliness and conflict which would arise from such attempt to tax *de minimus*

earnings has been obviated by (1) Idaho Code Section 63–3027A;[3] (2) the multistate compact[4] to which Idaho is a party; and (3) House Bill 655[5] which provides that no tax will be levied at all until earnings within the state reach a certain minimum level.

I regret my analysis lacks the persuasive power to deter my brothers from this dangerous and precedentless course—hopefully a comprehensive and artful petition for rehearing will cause a thoughtful revisitation of this case and its implications.

There is one thing to commend the majority opinion—it makes Idaho unique as the *only* state in the nation with no nexus over trainmen who labor within its borders and sleep elsewhere.

Idaho is already similar to a third-world nation in that outsiders extract its timber and minerals for manufacturing and processing elsewhere without paying a severance tax. The vision and perspective of this Court, ignoring the principle that the making of tax policy is for the legislature, furthers Idaho's status as a third-world nation.

BISTLINE, J., concurs.

## APPENDIX A

In the District Court of the Thirteenth Judicial District of the State of Montana, in and for the County of Yellowstone.

Glen McNerney, et al., Non–Montana Resident, Burlington Northern Railroad Employees Performing Services in Montana, Plaintiffs,

v

The State of Montana Department of Revenue, Defendant.

No. DV–81–2195

ORDER

The Parties herein having stipulated and agreed to a settlement in this matter and good cause appearing:

It is hereby ordered that the above-entitled action is dismissed with prejudice.

DATED this 24 day of August, 1982.

(s) ROBERT H. WILSON
DISTRICT JUDGE

## CLOSING AGREEMENT AND SETTLEMENT COMPROMISE

THIS AGREEMENT made and entered into on the date below stated between Glen McNerney, et al., Burlington Northern Railroad Employees listed on Exhibit "A", who are residents of Washington and provide services in Montana (hereinafter referred to as "Employees") and Montana Department of Revenue (hereinafter referred to as "Department");

WITNESSETH:

From January, 1978, up and through December of 1981, Employees performed services for their employer within the State of Montana. At various times during this pe-

---

3. **Computing tax of part-year or nonresident individuals, trusts and estates.**—In computing the tax of a part-year or nonresident individual, trust or estate, the tax imposed by section 63–3024, Idaho Code, shall be reduced to the proportion that the adjusted gross income of the taxpayer from Idaho sources bears to the total adjusted gross income from all sources.

4. The "multi-state tax compact" is codified in I.C. § 63–3701, to which twenty-two states are signatory.

5. House Bill 655 of the 1988 Legislature enacted I.C. § 63–3023B, which provides that transportation employees earning less than one-half of their income from activities within the state will be exempted from income taxation. The fiscal note to that bill lists a fiscal impact of "approximately $250,000 to $500,000 per year." Since our judicial legislation herein is of even broader scope, it will have an immeasurably larger fiscal impact, when applied to not only transportation employees, but others similarly situated.

riod, the Department notified the Employees that state taxes due Montana were unpaid and owing. Some or all of the Employees had not filed tax returns for 1978, 1979, 1980 and 1981, as required under the statutes of the State of Montana.

In October, 1981, a lawsuit was initiated by the Employees in the District Court, Yellowstone County, Montana, under Cause No. DV–81–2195.

The parties are entering into this Agreement in lieu of additional court proceedings under Cause No. DV–81–2195 based upon the following representations and understandings:

The parties ("Employees" and "Department") hereby stipulate and agree:

1. The Employees in the cause number mentioned above will pay Montana taxes for years 1978, 1979, 1980 and 1981.

2. Department will agree not to proceed now or in the future against Employees for any Montana taxes owing prior to 1978.

3. Travel and expense deductions incurred by the Employees will not be allowed as a deduction for tax years 1978, 1979, 1980 and 1981.

4. The Department will agree to review and recommend change of its rule of administrative procedure 42.16.1112, ARM, relating to travel and expense deductions applicable to nonresidents who file tax returns in Montana beginning with tax year 1982.

5. The tax returns for the four years mentioned above will be due October 15, 1982. No interest shall accrue for tax years 1978, 1979, 1980 and 1981. Beginning October 15, 1982, interest shall accrue at the statutory rate on unpaid balance of taxes. The Employees agree to pay one-third of the taxes for the four years mentioned above on October 15, 1982. There may be exceptions on a case-by-case basis for taxpayers who cannot afford such payment and who properly correspond with the Department. The first $100.00 of interest accruing from October 15, 1982, for each year per taxpayer shall be exempt.

6. The Employees shall pay the balance of tax owing (two-thirds) over a two-year period to be paid in quarterly installments. The first quarterly installment will be due December 31, 1982. These payments shall have a minimum balance of $100.00 unless the balance owing is less than $100.00 which amount shall then be due in full. Taxes paid shall first apply to oldest taxes owing.

7. Attached as Exhibit "B" and by reference incorporated herein is a list of individuals or groups the Department is currently actively pursuing to collect nonresident taxes owing.

8. Department will waive all penalties and late filing charges for the Employees for tax years 1978, 1979, 1980 and 1981. If any Employee should be delinquent in the quarterly installment owing, Department has the option, on a case-by-case basis, to institute penalties and late filing charges for 1978, 1979, 1980 and 1981. Date of payment of taxes will be deemed to be the date said payment is mailed.

9. Extensions may be granted by the Department on a case-by-case basis for good cause shown.

10. The pending litigation, being Cause No. DV–81–2195 in the District Court, Yellowstone County, Montana, shall be forthwith dismissed with prejudice and without costs.

DATED this 26 day of July, 1982.

        DEPARTMENT OF REVENUE

        Mitchell Building
        Helena, Montana 59620
        (s) Ellen Feaver
        ELLEN FEAVER, Director
        (s) R. Bruce McGinnis
        R. BRUCE McGINNIS Tax Counsel

        (s) Glen McNerney
        GLEN McNERNEY
        RICHTER, WIMBERLEY and ERICSON, P.S.
        By (s) Gary D. Brajcich
        GARY D. BRAJCICH
        By (s) Thomas L. Doran
        THOMAS L. DORAN
        Attorneys for Plaintiffs

BISTLINE, Justice, specially concurring in dissent of HUNTLEY, J.

The opinion authored by Justice Huntley and the oral arguments in this case telling of high speed trains whizzing through Idaho without stopping, have reminded me of my terms in the office of prosecuting attorney of Bonner County and Boundary County. Both Burlington lines (formerly Great Northern and Northern Pacific) ran through one or both counties. It was always generally understood that the personnel on those trains—this was back in the days of passenger trains, club cars, buffet cars, and dining cars—were subject to the laws of Idaho while in Idaho, and accordingly no liquor or beer was sold while the trains traversed the panhandle. If westbound train personnel sold drinks on leaving Thompson Falls or Libby, Montana, and if personnel on trains eastbound out of Spokane, Washington, sold drinks before crossing the Idaho state line, there was no violation of the law in the drinking of the drinks as the trains moved swiftly through Idaho. So it was understood, or at least so I understood then, and recollect now.

Accordingly, the Great Northern and the Northern Pacific did not go to the bother and expense of buying Idaho liquor licenses. Not only was a state license required if they chose to sell in Idaho, ch. 274, sec. 6, 1947 Sess. Laws, with the license, or duplicate thereof, having to be posted in the buffet, dining, or club cars, but county, city, or village licenses had to be acquired, for a license fee, of course. *Id.*, sec. 16. Bartenders also had to meet certain requirements, and be bonded in the amount of $1000. *Id.*, sec. 22, sec. 22A. Days and hours of permissible sale were set. *Id.*, sec. 25. State, county, and village officers had the right to examine premises where liquor was sold at any time. *Id.*, sec. 28. Prosecuting attorneys, sheriffs, and all other county, city, and village officers were placed under an obligation—under penalty of being removed from office for failure to comply—to inform against and punish any violations of the liquor law. *Id.*, sec. 33. A railroad company or bartender selling in Idaho without an Idaho license was subject-

ed to a fine of $1000, plus one to five years of imprisonment. *Id.*, sec. 35.

Some of these statutes may have been since amended, but for the most part are nearly the same. I.C., Title 23, Ch. 9.

Sheriff Don Maynard and I discussed our obligation to ride those trains from time to time, but it would have meant traveling to Spokane or the two last Montana stops to get aboard—and no getting off. Moreover, it would not have been reasonable for the railroad companies to have gone to the bother of purchasing state of Idaho licenses plus county and city or village licenses. There very well may have been violations by a bartender selling drinks while the trains were in Idaho, knowing full well that those in authority would not go to the trouble of investigating. If a drink was sold on a train while in Idaho it would have been an inadvertence on the part of a newly employed bartender who didn't know when he was in or out of Idaho. Whatever may or may not have been taking place, the bartenders were, while in Idaho, subject to Idaho law providing for fine or imprisonment—or both—if the law was broken.

Having lived in Bonner and Boundary counties for a quarter of a century, I feel relatively safe in stating that the non-stop trains going through those counties travel over the same tracks as do the locals. Upon that predicate it can be also added that both through trains and locals encounter the same crossings where railroad tracks intersect state and county highways, and city streets as well. The law in Idaho since before statehood, R.S. 1887 Sec. 69098, has been that any conductor, engineer, brakeman, switchman, or other person having charge in whole or in part of any railroad car, locomotive or train, who wilfully or negligently allows or causes the same to collide with another locomotive, car, or train, or with any other object or thing, resulting in death is punishable by imprisonment in Idaho for one to ten years. I.C. § 18–6001, as slightly amended in 1972.

Under the provisions of the next section, I.C. § 18–6002, it is a misdemeanor on the part of the engineer to omit to sound a bell

or whistle at least 80 rods from a crossing. Similarly under I.C. § 18–6003, it is a misdemeanor for certain railroad personnel to be intoxicated on the job.

Clearly, railroad personnel on trains traveling through Idaho, whether a local or non-stop, have been required to conform to the laws of Idaho. Equally clear, through trains, unlike airplanes, have as a nexus a firm commitment to Mother Earth and the laws of this state. Equally clear, in times of disaster such as happened in the 1950's on the Northern Pacific between Careywood and Athol, in Bonner County, Idaho, the county's emergency people responded, and the local hospitals cared for the injured.

The Idaho legislatures have, since territorial days, resolved the issue presented by declaring that railroad personnel in Idaho via trains on which they are employed are subject to criminal and civil provisions of Idaho law. If a distinction in the law has been drawn favoring those from Spokane who travel *through* on trains as against their fellow workers out on the *locals*, I am presently unable to grasp it. Nor am I able to fathom the justification for creating a distinction where the taxing authorities of this state are proceeding to treat equally the two classes of workers—only to be confronted by a barrier with flashing red lights.

HUNTLEY, J., concurs.

## ON DENIAL OF PETITION FOR REHEARING

JOHNSON, Justice.

## NONRESIDENT INDIVIDUALS AS WELL AS MULTI–STATE CORPORATIONS ARE ENTITLED TO PROTECTION OF THE NEXUS REQUIREMENT.

In its petition for rehearing the Commission contends that the concept of nexus should not be applied in the same fashion to multi-state corporations and to nonresident individuals. We are said to have erred in looking to principles of nexus developed in cases dealing with multi-state corporations in determining whether a sufficient nexus existed in this case to justify the imposition of income taxes on the train crews. This contention suggests that individuals are not entitled to the same protection of the nexus requirement as corporations are under the due process clause and the commerce clause.

■ Nonresident individuals do not have fewer rights than multi-state corporations do under the due process clause and the commerce clause. In *Shaffer v. Carter,* 252 U.S. 37, 40 S.Ct. 221, 64 L.Ed. 445 (1920), the Supreme Court evaluated the rights of an individual under the due process clause and the commerce clause. There is no indication in the opinion of the Court that the result would have been different if the taxpayer had been a corporation. In a companion case decided on the same day the Court upheld a state income tax on the income of a multi-state corporation. *Travis v. Yale & Towne Mfg. Co.,* 252 U.S. 60, 40 S.Ct. 228, 64 L.Ed. 460 (1920). The opinion in each case referred to the other. No distinction was made between the individual nonresident in *Shaffer* and the corporate nonresident in *Travis.* The same principles were applied in determining whether the respective states could tax the incomes of the individual and the corporation.

The decisions of other states also indicate there are no fewer rights for nonresidential individuals than there are for multistate corporations in matters of taxation. In *State of Alaska v. Petronia,* 69 Wash. 2d 460, 418 P.2d 755 (1966) and *Sjong v. State, Department of Revenue,* 622 P.2d 967 (Alaska 1981), both of which were cited by the Commission, the Alaska Supreme Court dealt with the rights of individual nonresident taxpayers. In neither case did the court distinguish the rights of individuals from those of corporations under the due process clause and the commerce clause. In both cases the court went through an extensive analysis of the due process clause and the commerce clause, citing many leading cases of the United States Supreme Court dealing with multistate corporations. The same is true of the

New Mexico Supreme Court in *Lung v. O'Chesky*, 94 N.M. 802, 617 P.2d 1317 (1980), also cited by the Commission.

■ Nexus is a threshold test in due process and commerce clause state taxation cases that applies to both individuals and corporations. Our task in this case is to determine the principles that have been developed in Supreme Court cases concerning the requirement of nexus and to apply those principles to the facts here. It is not "shoehorning" to use the concept of nexus developed in the multi-state corporation cases in deciding a case that involves nonresident individuals. This is merely the necessary process of reasoning from established legal principles in deciding a case where there is no controlling precedent.

It is true that a multi-state corporation is a fictitious entity that, through its agents and employees, can be present in more than one state at a time, while an individual can be in only one state at any moment. This fact does not render inapplicable the principles developed by the Supreme Court to determine whether the nexus between the train crews and Idaho is sufficient to allow Idaho to impose an income tax on these nonresident individuals. Presence in a state is only one of the factors that the Supreme Court has weighed in determining whether a corporation is subject to state taxation. If presence alone were sufficient, the whole concept of nexus would be unnecessary. Not just any nexus (connection) is sufficient to satisfy the Court's test. It must be a "substantial nexus." *Complete Auto Transit, Inc. v. Brady*, 430 U.S. 274, 279, 97 S.Ct. 1076, 1079, 51 L.Ed. 2d 326 (1977).

The cases from other states dealing with taxation of nonresident individuals indicate that substantial nexus is a threshold test that is to be applied to individuals as well as to corporations. In *Petronia*, the Alaska court accepted the principle that before a state may levy a personal income tax upon a nonresident there must be "minimum connections between the nonresident and the taxing authority." 418 P.2d at 758. In doing so the court referred to the decisions of the Supreme Court in *Northwest-*

*ern States Portland Cement Co. v. Minnesota*, 358 U.S. 450, 79 S.Ct. 357, 3 L.Ed.2d 421 (1959) and *Wisconsin v. J.C. Penney Co.*, 311 U.S. 435, 61 S.Ct. 246, 85 L.Ed. 267 (1941). These were both cases involving multi-state corporations. After acknowledging the applicability of the minimum connections test to individuals, the Alaska court concluded that the wages earned by individual seamen while they were in Alaskan waters was the most significant benefit they received from the state. The court pointed out:

> The business productivity generated by Alaska was accountable for the wages earned by the [seamen] when they were in Alaskan waters.... We find no distinction between *business generated by the economic activities of Alaska* accountable for the employment of nonresidents whether it be on land or on the water within the Alaskan boundaries. We are satisfied that the *benefits of employment afforded by this economic activity* of the state of Alaska constituted minimum connections within the rule to avoid a denial of due process under the Fourteenth Amendment to the United States Constitution.

418 P.2d at 758–59 (Emphasis added).

If the presence of the seamen without more would have satisfied the minimum connections requirement, the Alaska court would not have found it necessary to find another connection. If the earning of wages alone would have satisfied the minimum connections requirement, the Alaska court would not have found it necessary to have tied those wages to the "business generated by the economic activities of Alaska" and the "benefits of employment afforded by this economic activity of the state of Alaska."

In *Sjong*, the Alaska court dealt with a case in which Alaska had asserted an income tax against a nonresident individual who caught crabs outside of Alaska in international waters and then sold the crabs in Alaska. After recognizing the applicability of the minimum connections or substantial nexus requirement, the court concluded that "even though Sjong fishes in international waters, the activities of the

state have a substantial effect on his activities" and that the crab industry "has been fostered by the policies of the state and protected by its various police powers." 622 P.2d at 971. If mere presence in the state were sufficient, these additional rationales would not have been necessary to support a finding of the required minimum connections or substantial nexus.

## PUSHING AND PULLING A THROTTLE DOES NOT CREATE A SUBSTANTIAL NEXUS.

In his opinion on denial of petition for rehearing, Justice Huntley poses the conundrum that the physical phenomenon of an engineer pushing and pulling a train's throttle while the train is traveling through Idaho cannot truly be transformed into "throttle pushing and pulling" in Washington or Montana. The implication is that the majority opinion ignores the "substantial nexus" of an engineer's pushing and pulling a throttle in Idaho and attempts to transmigrate this activity to our sister states. The answer to this purported puzzle is that it depends upon the circumstances in which the engineer is pushing or pulling the throttle whether it will be deemed to be a "substantial nexus," subjecting the engineer's income for doing so to tax in Idaho. If the engineer were a resident of Idaho or were pushing or pulling the throttle while involved in employment that was generated by the economic activity of Idaho, a substantial nexus would exist. When the engineer is a nonresident and pushes or pulls the throttle while driving a transcontinental train across Idaho without engaging in any activity generated by the economy of Idaho, there is not a substantial nexus. Other factual situations will require further interpretations of what constitutes substantial nexus. It is not appropriate for us to prejudge those cases here. It is sufficient for us to decide this case and to state our rationale.

The Commission argues that while the train crews are working in Idaho they are receiving the benefits of Idaho's organized society and should therefore be subject to Idaho income taxes. The Commission cites Justice Huntley's dissent for the contentions that the train crews are provided the benefits of Idaho's state and local governmental structures and the opportunity to exercise their intelligence, skill and labor while performing work for their employer within Idaho. It is these "fruits of civilization," the Commission argues, that make it possible for BN to operate its trains in Idaho, thus giving rise to the employment of the train crews.

The concept that taxes are what we pay for the fruits of civilization has been attributed to Justice Oliver Wendell Holmes. *Wisconsin v. J.C. Penney*, 311 U.S. at 446, 61 S.Ct. at 250. What Justice Holmes said was: "Taxes are what we pay for civilized society,...." *Compania General de Tabacos de Filipinas v. Collector of Internal Revenue*, 275 U.S. 87, 100, 48 S.Ct. 100, 105, 72 L.Ed. 177 (1927) (Holmes, dissenting). In that case Holmes said that he could see no ground for denying the right of the Philippine Islands to tax insurance premiums paid by a Spanish company to a London insurer to insure merchandise stored in the Philippines, "unless it can be shown that it has conferred no benefit of a kind that would justify the tax." *Id.* He then pointed out that "the government of the Islands was protecting the property at the very moment in respect of which it levied the tax." *Id.* at 101, 48 S.Ct. at 105. This makes it clear that Holmes did not rely on a nebulous concept of "fruits of civilization," but rather embodied in that concept the idea that the taxpayer must have received some benefit from the governmental unit imposing the tax.

In *J.C. Penney*, the Supreme Court in upholding a corporate income tax on earnings attributable to activities in Wisconsin pointed out that "the incidence of the tax as well as its measure is tied to the earnings which the State of Wisconsin has made possible, insofar as government is the prerequisite for the fruits of civilization." 311 U.S. at 446, 61 S.Ct. at 250. The fruits of civilization in that case included the permission of Wisconsin for J.C. Penney Co., a Delaware corporation having its principal offices in New York, to carry

on business in Wisconsin. Here there is no comparable situation. The train crews did not have to obtain permission of Idaho to be employed by BN on the through transcontinental trains passing through Idaho. Saying that the train crews benefited from the fruits of civilization in Idaho when they were passing through amounts to nothing more than saying that they were present here. Mere presence in a state does not fulfill the requirement of substantial nexus.

In *Lung v. O'Chesky,* the New Mexico Supreme Court upheld the power of the state to tax income of Texas residents who were employed on the White Sands Missile Range, a federal enclave. The court noted that the power to tax rests on the benefits of the "fruits of society" and the "opportunity to exercise 'intelligence, skill, and labor while employed in the State of New Mexico.'" 617 P.2d at 1319. It is apparent that the employees of the missile range traveled from Texas to New Mexico and remained there to carry out their work. They were not merely passing through the state as the train crews were in this case. In any event, to the extent that *Lung* is contrary to our decision here, we decline to accept its logic.

The Commission argues that if BN were unable to operate its trains in Idaho, it would be unable to provide the jobs from which the trains crews receive their wages. It is the opportunity to be employed, says the Commission, that constitutes sufficient nexus for the state to tax the wages of the train crews. This opportunity is apparently the "fruit of civilization" in Idaho that the train crews are asserted to enjoy while passing through the state. This argument overlooks the fact that the train crews did not obtain their employment in Idaho, but in Washington. Their opportunity for employment arose there. They entered upon their employment in Washington and traveled between Washington and Montana in the course of their employment. The fact that in the course of their employment they traveled through Idaho is purely coincidental. Nothing in Idaho provided them with the opportunity for their employment. Their only connection with this state is that the trains on which they were employed

traveled through the state. Neither BN nor the train crews transacted any business in Idaho during these trips. The relationship of the train crews was with BN, not with Idaho. The fact that they were paid for duties they performed on the trains while the trains were traveling through Idaho does not amount to their benefiting from the fruits of civilization in Idaho. Idaho did not provide them with the opportunity for employment; only BN provided them with that opportunity.

One can imagine a number of circumstances in which nonresident individuals who have been employed outside the state travel across Idaho during the course of their employment. For example, a bank executive from Denver may fly regularly between Denver and Seattle, passing over Idaho on each trip. By the logic of the Commission, this executive would be required to pay Idaho income tax while traveling across Idaho. Idaho would apparently have provided this executive with the fruits of its civilization for which it was entitled to payment. No case has been cited that would subject this banker to income taxation by Idaho, merely because of invasion of our air space. There is no authority for doing so. If the Denver executive traveling to Seattle by airplane is not subject to Idaho income tax, should the same executive be subject to Idaho income tax because he chooses to travel through Idaho by train, by bus, or by private automobile instead of by airplane. If the Denver executive is not subject to Idaho income tax while traveling through Idaho, the Commission does not offer any rationale why the train crews should be subject to income tax while traveling through Idaho. Perhaps it is because throttle pushing and pulling is not as exempt from taxation as pencil pushing and pulling. I am not prepared to premise a constitutional distinction on such an anti-egalitarian construct.

## THE "DE MINIMIS" PROVISIONS OF I.C. §§ 63–3030 AND 63–3023B ARE IRRELEVANT TO THE ISSUE OF NEXUS IN THIS CASE.

The Commission argues that I.C. Sec. 63–3030 establishes a *"de minimis"* provi-

sion that removes any perceived unconstitutionality of the tax on the income of the train crews earned while they are traveling through Idaho. This statute currently provides that a nonresident individual is not required to file an income tax return in Idaho unless the gross income of the individual from Idaho sources exceeds (1) $3,300, if unmarried and not a surviving spouse, (2) $4,400, if a surviving spouse, or (3) $5,400, if entitled to make a joint return. The Commission also invokes the 1988 enactment of the Idaho legislature now codified in I.C. Sec. 63–3023B, effective retroactively to January 1, 1988. This new statute exempts a nonresident individual from filing an Idaho income tax return or paying Idaho income taxes, if the individual:

> (a) Is an employee of a railroad or motor carrier; and
>
> (b) Performs regularly assigned duties in the course of such employment aboard a train or motor vehicle in this state and at least one (1) other state of the United States; and
>
> (c) Earns less than one-half (½) of his income from employment aboard a train or motor vehicle as a result of activities in this state; and
>
> (d) Earns no other income from sources within this state; and
>
> (e) Is, during the entire taxable year, a resident of a state which does not impose on individuals a tax, measured by net income, or which grants to Idaho residents an exemption from tax similar to that granted in this section.

I.C. Sec. 63–3023B (1988).

*De minimis* is a concept derived from the legal maxim, "*De minimis non curat lex*" (the law does not concern itself with trifles). *Crosby v. Rowand Machinery Co.*, 111 Idaho 939, 944, 729 P.2d 414, 419 (Idaho App.1986). What is a "trifle" is apparently a very flexible concept in the view of the Commission. When I.C. Sec. 63–3030 was enacted in 1959, it was $600. More recently, it has been $3,300, $4,400, or $5,400, depending on the status of the individual. For transportation workers traveling through Idaho it may now be up to one-half of the income they earn during their sojourn through the state. Tomorrow it may be some other amount, or zero, depending on the policy enacted by the legislature.

■ None of these formulations is relevant to the determination of whether there is substantial nexus as required by the due process clause and the commerce clause. Nexus is concerned primarily with the quality of the connections an individual or business entity has with a state, not with the quantity of the individual's or entity's income. "Minimum connections" does not mean minimum income.

## THE COMMERCE CLAUSE PROTECTS INDIVIDUALS WHO ENGAGE IN OCCUPATIONS THAT CAUSE THEM TO CROSS STATE BOUNDARIES.

The Commission contends that the commerce clause is not applicable to this case because there is no sale of goods or transportation services. The Commission would restrict "commerce" to transactions involving sales. This concept of commerce is archaic. As the Supreme Court said in *Jordan v. Tashiro*, 278 U.S. 123, 127–28, 49 S.Ct. 47, 48, 73 L.Ed. 214 (1928):

> While in a narrow and restricted sense the terms "commerce," or "commercial," and "trade" may be limited to the purchase and sale or exchange of goods and commodities, they may connote, as well, other occupations and other recognized forms of business enterprise which do not necessarily involve trading in merchandise. [Citation omitted.] And although commerce includes traffic in this narrower sense, for more than a century it has been judicially recognized that in a broad sense it embraces every phase of commercial and business activity and intercourse. See *Gibbons v. Ogden*, 9 Wheat. 1, 6 L.Ed. 23.

■ The train crews worked across state boundaries and were involved in interstate commerce. They are entitled to the protection of the commerce clause, the same as if they sold goods or transportation services.

SHEPARD, C.J. and BAKES, J., concur.

BISTLINE, Justice on denial of petition for rehearing.

With the Court's May 24, 1988, opinion in its hands, the Tax Commission has asked that a rehearing be granted in order that on reconsideration the Court would modify its opinion and hold that the Idaho Income Tax Act, insofar as it imposes a tax on the income of train crew members working on trains while traveling through Idaho, does not violate the due process clause of the fourteenth amendment or the commerce clause (art. I, § 8, cl. 3) of the United States Constitution; and, if not, that in any case the Tax Commission requests that the Court clarify its original opinion and articulate the standard to be employed by the commission in administering the tax law when questions of nexus arise.

The Tax Commission's brief asserts that the rehearing is requested because the opinion of the Court, filed May 25, 1988, is the first ruling by any court of any jurisdiction to hold that a state's attempt to tax a nonresident individual performing labor within that state violates the due process clause of the fourteenth amendment and the commerce clause (art. I, § 8, cl. 3) of the United States Constitution.

The brief points to four areas in which it asserts that the Court has gone astray:

First, the opinion relies upon nexus concepts dealing with fictional entities, i.e., corporations, to achieve a tortured, and completely untenable result which provides no reasoning or guidance to either taxpayers or the Tax Commission.

Second, the opinion fails to consider Idaho Code § 63–3030 which provides that no tax shall be levied on nonresidents until the total Idaho source income exceeds specified minimum levels. Consideration of this "de minimis" statute would eliminate this Court's fear of "sustaining taxes on the income generated by any person who crosses Idaho by any means without stoping or transacting business here, but who is being compensated while in transit." 1988 Opinion No. 39, at 14.

Third, the opinion misconstrues the requirement of "economic contact" necessary to sustain nexus under the due process clause for a nonresident individual based on a state's provision of the "fruits of civilization." Idaho has provided the protections and business climate which are necessary for these employees to receive the substantial benefit of employment within the state.

Fourth, the commerce clause cannot be violated on the present facts because there are no "goods in transit" or "interstate sales." The tax at issue is not levied on "goods in transit" or "interstate sales," but rather on the income generated from the labor of the train crews while in Idaho.

Fifteen pages of discussion appear to sustain the propositions so advanced. In my view the Court is remiss in not affording the Tax Commission the opportunity to further pursue its contentions at a rehearing, and I have voted to do so.

HUNTLEY, Justice, on denial of petition for rehearing.

A state income tax is a tax imposed on income earned from labor performed within a state. All states under all prior federal and state decisions, have the power to tax income earned in the state.

If through the use of legal constructs and through use of the word "nexus," the physical phenomenon of an engineer pushing and pulling on a train's throttle while the train is traveling through Idaho can truly be transformed into performance of labor in Washington or Montana, then what the majority has written is a correct legal analysis.

If, on the other hand, performance of work in Idaho is performance of work in Idaho, then I must differ with the legal analysis.

The excellent, cogent and thoughtful brief on Petition for Rehearing by the Attorney General, which I attach hereto as Appendix A, may give the reader an opportunity to better evaluate which position is correct.

At the moment, the following forty states have laws providing for the taxation of individual earned income:

| | | |
|---|---|---|
| Alabama | Arizona | Arkansas |
| California | Colorado | Delaware |
| Georgia | Hawaii | Idaho |
| Illinois | Indiana | Iowa |
| Kansas | Kentucky | Louisiana |
| Maine | Maryland | Massachusetts |
| Michigan | Minnesota | Mississippi |
| Missouri | Montana | Nebraska |
| New Jersey | New Mexico | New York |
| North Carolina | North Dakota | Ohio |
| Oklahoma | Oregon | Pennsylvania |
| Rhode Island | South Carolina | Utah |
| Vermont | Virginia | West Virginia |
| Wisconsin | | |

All have a statute similar to Idaho Code § 63–3024 imposing a tax on non-resident labor within a state. Not one single case holds that any of those forty states lack the power to tax non-residents who pursue their occupations while transiting the state.

The majority appears to have been impressed by an argument presented by the trainmen that to tax them, would mean that the next step might be a tax on the wages of airline pilots or airline passengers such as bankers who perform work while transiting the state of Idaho on a transcontinental flight. To the majority such would appear to be a conceptually unwarranted exercise of the taxing power. However, the fact is, that the states do have the power to so tax, but do not exercise it due to the onerous bookkeeping expense which would be involved both for the state and the taxpayer and, thus, they handle that problem through their *"de minimis"* statutes such as I.C. § 63–3030. No case has ever held that that banker or airline pilot is not subject to taxation and there is no good reason why, when computer processing makes such calculations economical, the airline pilot earning $100,000 a year should escape taxation on his income while the ground crews working to make the flight possible are subject to income taxation.

I am most distressed by what I believe is the majority's incorrect grounding of its opinion on the Interstate Commerce Clause. Just as the interstate commerce clause is not implicated as an "undue burden on the airline" by taxing the wages of a man who lives near St. Anthony, Idaho, who works on the air traffic control radar on Sawtelle peak, neither would the commerce clause be implicated by an income tax requiring the airline pilot who flies for only six minutes of a transcontinental flight in the air space of the District of Columbia to pay a fair proportion of income tax to the states he flies over in route to thirty-five minutes in California air space while landing in San Francisco.

One final example demonstrates the reason why no other court has ever misconstrued the commerce clause to limit a state's power to tax in cases of this nature:

(1) A.B.N. engineer resident on the Idaho side of the border who commutes to Spokane to board his train for the trip back across Idaho to Montana, pays his Idaho income tax with the majority agreeing his tax payment does not "burden commerce."

(2) Why then, would payment of the same proportionate tax by an engineer resident in Spokane suddenly constitute an unconstitutional burden?

The opinion on denial by Justice Johnson contains the following sentence.

"Neither B.N. nor the train crews transacted any business in Idaho during these trips."

I suggest that the train crew members did in fact transact their business of operating the trains in Idaho and, therein, the majority recognizes the proper test, but regrettably fails to follow where its logic leads. When a person is physically present performing his work in Idaho, Idaho possesses the total, ultimate and absolute nexus.

The statement that "[n]either *B.N.* nor the train crews transacted any *business* in Idaho during these trips" displays the flawed analysis in two other respects.

(1) In determining income tax incidence upon an individual, the nature of the employer's business is usually of little relevance and serves only to confuse the majority analysis in this instance.

(2) Secondly, it seems to me that business of the Burlington railroad is that of *transportation*. "Transportation" is a derivative of the Latin word "trans" (across) and the French word "portare" (to carry). It would seem to me that B.N.'s business of carrying goods and people across Idaho is business in Idaho rather than in Wash-

ington or Montana. Further, as to the source of the fruits of civilization which make the enterprise possible, it seems to me that while the train crosses Idaho, it is the terra firma of Idaho, the section hands of Idaho, the traffic signal maintenance crews of Idaho, and the police and fire protection provided by Idaho people which contribute more to the transportation enterprise than do the similar support forces many miles away in other states.

APPENDIX A TO OPINION OF JUSTICE HUNTLEY ATTORNEY GENERAL BRIEF ON PETITION FOR RE-HEARING

Rehearing is requested in this case because the Opinion of this Court, filed May 25, 1988, is the first ruling by any court of any jurisdiction to hold that a state's attempt to tax a nonresident individual performing labor within that state violates the Due Process Clause of the Fourteenth Amendment and the Commerce Clause (Art. I, § 8, cl. 3) of the United States Constitution.

Initially, the Opinion relies upon nexus concepts dealing with fictional entities, i.e., corporations, to achieve a tortured, and completely untenable result which provides no reasoning or guidance to either taxpayers or the Tax Commission.

Second, the Opinion fails to consider Idaho Code § 63–3030 which provides that no tax shall be levied on nonresidents until the total Idaho source income exceeds specified minimum levels. Consideration of this "de minimis" statute would eliminate this Court's fear of "sustain[ing] taxes on the income generated by any person who crosses Idaho by any means without stopping or transacting business here, but who is being compensated while in transit." 1988 Opinion No. 39, at 14.

Third, the Opinion misconstrues the requirement of "economic contact" necessary to sustain nexus under the Due Process Clause for a nonresident individual based on a state's provision of the "fruits of civilization." Idaho has provided the protections and business climate which are necessary for these employees to receive the substantial benefit of employment within the state.

Fourth, the Commerce Clause cannot be violated on the present facts because there are no "goods in transit" or "interstate sales." The tax at issue is not levied on "goods in transit" or "interstate sales," but rather on the income generated from the labor of the train crews while in Idaho.

I.

THE COURT RELIED UPON NEXUS CONCEPTS DEALING WITH FICTION-AL ENTITIES TO ACHIEVE A TOR-TURED AND COMPLETELY UNTEN-ABLE RESULT WHICH PROVIDES NO REASONING OR GUIDANCE TO EITHER TAXPAYERS OR THE TAX COMMISSION.

The United States Supreme Court has held that a state may impose a tax on incomes earned by nonresident individuals from their occupations carried on within the state. *Shaffer v. Carter*, 252 U.S. 37, 52, 40 S.Ct. 221, 225, 64 L.Ed. 445 (1920). In upholding the income tax on a nonresident individual, the court in *Shaffer* reasoned that the states have the general duty of protecting and preserving "all persons, property, and business transactions within their borders ..." *Id.* 252 U.S. at 50, 40 S.Ct. at 224. As a consequence of these protections, the state has a right to demand a contribution in the form of taxes from those who profit from the protections provided by the state. *Id.* In reinforcing this principle, the court stated:

That the state, from whose laws property and business and industry derive the protection and security without which production and gainful occupation would be impossible, is debarred from exacting a share of those gains in the form of income taxes for the support of the government, is a provision so wholly inconsistent with fundamental principles as to be refuted by its mere statement.

*Id.*

The United States Supreme Court has also mandated "... that there be a sufficient nexus between the presence, property

or activities of the nonresident and the state attempting to impose the tax in order to survive a challenge under the due process clause...." 1988 Opinion No. 39, at 7. However, the Opinion in this case relies upon concepts pertaining to nexus announced in numerous United States Supreme Court decisions dealing with the fictional entity of corporations (in particular, foreign corporations operating in multiple states) in an attempt to determine whether a nonresident individual performing labor within Idaho has a sufficient connection with Idaho to be subject to its income tax. In announcing the result of this case, the Court fails to formulate a general test applicable to future cases or to set forth its reasoning behind the result. Perhaps the reasoning is omitted because it is based on the structural defect of shoehorning corporate nexus principles into individual nexus principles.

The distinctions between a corporation and an individual with regard to the concept of nexus are paramount. A corporation, by definition, is a fictional entity which can act only through its officers or agents. Further, a corporation can have a "presence" in more than one state at any given moment, i.e., a multi-state corporation. An individual, on the other hand, can be in only one place at one time. When an individual is working in state A, he cannot be working simultaneously in state B. Thus, an individual performing labor or personal services within a state, receiving income thereby, has derived that income from sources within said state. *Gee v. West*, 90 Idaho 173, 409 P.2d 116 (1965). This Court so stated at page 5 of its Opinion: "where compensation for personal services is involved, the source of income is the location where the services are performed."

Therefore, the Court erred in looking to principles of nexus dealing with corporations, particularly multi-state corporations, to determine whether or not an individual with complete physical presence in Idaho has a sufficient "presence" in Idaho to support a finding of nexus.

II.

THE COURT'S FEAR OF THE STATE TAXING "ANY PERSON WHO CROSSES IDAHO BY ANY MEANS WITHOUT STOPPING OR TRANSACTING BUSINESS HERE, BUT WHO IS BEING COMPENSATED WHILE IN TRANSIT" IS WITHOUT FOUNDATION.

Idaho Code § 63–3030 sets forth the minimum amount of income a nonresident individual must earn from Idaho sources before an income tax can be levied, i.e., a "de minimis" provision. Idaho Code § 63–3030 has been part of the income tax act since its enactment in 1959, and has been periodically amended to increase the minimum income that a taxpayer must earn prior to being subject to a filing obligation. In addition, House Bill 655 of the 1988 Legislature enacting Idaho Code § 63–3023B sets forth *further* limitations specifically aimed at transportation employees.

As enacted in 1959, the de minimis provision provided that a nonresident individual could earn income from Idaho sources of up to $600 before a tax reporting obligation would occur. Currently, a nonresident single individual must have income from Idaho sources amounting to at least $3,300 before a tax reporting obligation occurs. A nonresident individual filing a joint return must earn at least $5,400 from Idaho sources before a tax reporting obligation occurs. Thus, a nonresident individual crossing Idaho and being compensated while in transit would not be subject to Idaho tax until his income from Idaho sources is substantial enough to exceed the statutory minimum.

De minimis provisions with regard to the Due Process Clause were specifically addressed in the case of *Commonwealth, Dept. of Taxation v. B.J. McAdams, Inc.*, 227 Va. 548, 317 S.E.2d 788 (1984). There, the Supreme Court of Virginia stated that a "de minimis" provision was added to the taxation scheme "[i]n order to conform to the Due Process requirements of the Fourteenth Amendment to the Federal Constitution...." *Id.* 317 S.E.2d at 792.

What must be remembered is that the train crews in question are not "merely passing through Idaho" on a sporadic or inconsistent basis. Quite the opposite is true. The train crews are passing through Idaho on a regular and systematic basis. Depending upon whether a time or mileage apportionment factor is used, between 25% and 40% of the wages earned by the train crew members are being earned while they are in Idaho.

As an example of the presence necessary in Idaho to meet the current minimum filing requirements, if a train crew member (filing single) earned $60,000 a year, and a bare minimum 25% apportionment factor was used, the train crew member would be able to work continuously across Idaho for well over 2 months prior to incurring any Idaho tax liability. Using the same facts, a train crew member filing jointly could work continuously across Idaho for over a third of the year prior to incurring any Idaho tax liability.

A second example to be considered is the distinction between the engineer operating a through train that does not stop, as opposed to a second engineer operating a train that makes one momentary stop, but who never moves from his seat and then continues on his journey through the state. The Opinion of this Court implies that one stop is sufficient to tax the second engineer, yet the first goes tax free. Because the Court failed to set forth its reasoning behind the result, the Tax Commission can only guess as to how this area of the law should be administered in the future.

During reargument, a question was raised concerning a banker riding on a train and working while crossing Idaho. The Court inquired, ignoring the de minimis statutes, how often the banker could work while traveling through Idaho before incurring an Idaho tax liability. Admittedly, an incomplete response was given.

To properly answer the question, it must be addressed both statutorily and in the due process context. Statutorily, as discussed earlier in this brief, any individual performing labor or personal services within the state has Idaho source income which is subject to Idaho income tax. *Gee v. West, supra.* Therefore, *any* wages received for labor performed within Idaho would be subject to income tax under the taxing statutes, absent the de minimis provision. This response was given during reargument.

However, the de minimis provisions *cannot* be ignored in the due process context because that is what sets the floor to satisfy the minimum contacts necessary to support nexus. Without the de minimis provisions, a nonresident individual coming into Idaho to work for one day, thereby earning $100.00, would incur an Idaho income tax liability. Statutorily, it makes no difference if he digs a ditch or operates a through train. That individual has Idaho source income subject to Idaho's income tax.

On the other hand, *with* the de minimis provisions, the nonresident individual would not be subject to tax until such time as he earned sufficient income to exceed the minimum filing requirements, thereby meeting the minimum contacts necessary to satisfy the nexus requirement of the Due Process Clause. Again, it makes no difference if the individual digs a ditch or operates a through train. Due process requirements are satisfied if the nonresident individual has earned income from Idaho sources which meet or exceed the de minimis statutory filing requirements.

## III.

### THE COURT HAS MISCONSTRUED THE REQUIREMENT OF "ECONOMIC ACTIVITY WITHIN IDAHO" NECESSARY TO SUSTAIN NEXUS UNDER THE DUE PROCESS CLAUSE.

Although the Court correctly held that Idaho is the source of the income of the train crew members while they are traveling through Idaho, the Court failed to recognize the contributions made by Idaho to the production of this income. In failing to recognize Idaho's contributions, the Court erred in holding that:

the Idaho law imposing a tax on the income of these employees while they are

970

traveling through Idaho violates the due process cause of the fourteenth amendment and the commerce clause (art. I § 8, cl. 3) of the United States Constitution.

1988 Opinion No. 39, at 2.

The United States Supreme Court has stated:

> A state is free to pursue its own fiscal policies, unembarrassed by the Constitution, if by the practical operation of a tax *the state has exerted its power in relation to opportunities which it has given, to protection which it has afforded, to benefits which it has conferred by the fact of being an orderly, civilized society.*
>
> \*   \*   \*   \*   \*   \*
>
> The simple but controlling question is whether the state has given anything for which it can ask return. [Emphasis added.]

*Wisconsin v. J.C. Penney Co.,* 311 U.S. 435, 444, 61 S.Ct. 246, 249–50, 85 L.Ed. 267 (1940). The Court cited the above language in its Opinion as the beginning step in determining nexus. However, the Court then went on to cite numerous United States Supreme Court decisions dealing with multistate corporate income tax or corporate sales tax situations which are completely inapposite to the facts of the present case. Further, the Opinion completely ignores the numerous decisions cited by the Tax Commission (discussed below) which deal specifically with economic contacts sufficient to sustain nexus between a nonresident *individual* and a taxing state. Even so, every single case cited by the Court in its analysis of the nexus concept concluded that sufficient contacts *did* exist to satisfy due process requirements and to justify imposition of state taxes.

The Opinion of this Court states at page 13 that the wages of the train crew members "... are not attributable to any economic activity within Idaho, and that Idaho markets and commerce do not affect their income in any degree." This statement is inconsistent with applicable case law.

In *Lung v. O'Chesky,* 94 N.M. 802, 617 P.2d 1317 (1980), New Mexico sought to tax residents of Texas who were employed on the federal enclave known as the White Sands Missile Range. The wages of the federal employees were in no way dependent upon New Mexico markets and commerce, nor were they attributable to any economic activity within New Mexico. Nevertheless, the Supreme Court of New Mexico held:

> *The power to tax does not rest on a measurable economic duty of the State towards its citizens, but on less tangible benefits, on the "fruits of civilization".* J.C. Penney Co., [311 U.S.] at 446, 61 S.Ct. at 250, quoting *Compania de Tobacos v. Collector,* 275 U.S. 87, 100, 48 S.Ct. 100, 105, 72 L.Ed. 177 (1927) (Holmes, J., dissenting). The *opportunity* to exercise "intelligence, skill, and labor while employed in the State of New Mexico" has been held to be sufficient benefit to support an income tax. *Jackling v. State Tax Commission,* 40 N.M. 241, 248, 58 P.2d 1167, 1171 (1936). Under this test, plaintiffs have a sufficient nexus with New Mexico to be taxed. [Emphasis added.]

*Id.* 617 P.2d at 1319. Clearly, the New Mexico Supreme Court held that the *opportunity* of employment within the state was sufficient, without regard to whether or not the employment was dependent upon New Mexico markets and commerce, or any economic activity within New Mexico.

In *Sjong v. State, Dept. of Revenue,* 622 P.2d 967 (Alaska 1981), the Supreme Court of Alaska also looked at the minimum connection of a nonresident individual sufficient to satisfy due process requirements. In *Sjong,* the court looked to indirect benefits of economic activity as well as direct benefits of economic activity within a state. The court looked to "business income generation" to determine:

> that unlike the services rendered to an ordinary traveler, the services, benefits, and protections offered to Sjong are directly related to generating his income. ... the availability of emergency medical services, [and] repair facilities ... clearly benefits his business operations....

*Id.* at 970. The *Sjong* court cited the case of *State of Alaska v. Petronia*, 69 Wash.2d 460, 418 P.2d 755, 759 (1966), in support of its business income generation concept by quoting:

> "We are satisfied that the *benefits of employment* afforded by this economic activity of the state of Alaska constituted minimum connections within the rule to avoid a denial of due process under the Fourteenth Amendment to the United States Constitution." [Emphasis added.]

*Id.* at 971. This principle is completely opposite to the one stated by this Court in its reading of the *Petronia* case.

The economic activity in *Petronia* ran between the state and the employer of the defendants therein. In turn, the employer was able to offer the benefit of employment to the nonresident seamen. Thus, the *Petronia* court, in rejecting the defendants' (employees') argument that they had not received a benefit from the state, held:

> [the argument] overlooks a most significant element considered in applying the test of benefits in determining minimum connections. Probably the most significant benefits in the eyes of these defendant seamen are the wages they contemplated receiving for their services during the course of the vessel's voyage. *The business productivity generated by Alaska was accountable for the wages earned by the defendants* when they were in Alaska waters. [Emphasis added.]

418 P.2d at 758.

Although the Court cited the above language in its Opinion at page 14, with regard to the "importance of the economic activity generated by the state" (1988 Opinion No. 39, at 13–14), the Court misconstrued the requirement of "economic contact" by failing to recognize that the employer providing the wages is sufficient to meet the nexus requirement of due process.

The Court's Opinion also states at page 13:

> It would be unfair to allow the state to impose a tax on the income of the train

crews earned while they are merely passing through Idaho.

However, the train crew members are not "merely passing through Idaho". This was clearly pointed out in the trial court's memorandum opinion at page 25–26:

> while operating the train in Idaho the plaintiffs [train crew members] are performing their duties carefully and diligently to preserve and protect their own safety and preserve and protect the safety and security of persons on or near the railroad track and to preserve and protect the extremely valuable equipment and cargo entrusted to their care.

The presence of the train crew members within Idaho is not incidental to the performance of the labor being compensated. The train crew members are being paid to use their skill, intelligence and labor to safely and timely negotiate the train and its contents from Washington, through Idaho, to its destination in Montana, and viceversa. This skill, intelligence and labor is not turned off upon reaching the Washington–Idaho border and then turned back on upon reaching the Idaho–Montana border.

While the crew members are working in Idaho they are receiving the benefits of Idaho's organized society. As Justice Huntley points out in his dissent at page 24:

> the trainmen are provided many benefits and protections by Idaho's state and local governmental structures. It is these protections which provide the trainmen the opportunity to exercise their intelligence, skill and labor while performing work for their employer within Idaho. In addition, it is these same protections, i.e., the "fruits of civilization," which make it possible for Burlington Northern to operate its trains in Idaho, thus giving rise to the employment of Burlington Northern employees.

A very real example of the protections provided by Idaho's state and local governmental structures of which the train crew members benefit is the case of *People v. Williams*, 1 Idaho 85 (1866). On March 3, 1863, prior to statehood, the territory of Idaho was organized by Congress from

four already existing territories, thus becoming a separate political community. Because the new territory was carved out of four existing territories, the usual practice of recognizing the laws of the former government until new laws could be adopted was not feasible. This left the new territory of Idaho with no criminal statutes until such could be enacted by the new government. The defendant, John Williams, was charged with committing the crime of highway robbery during the month of September, 1863, in the county of Boise, territory of Idaho. The court held that because the crime, assuming the facts alleged in the indictment to be true, was committed after the laws of the former territory were extinguished, but prior to the time new criminal statutes could be enacted, that:

> there was no statute punishing the offense charged in this indictment at the time it was alleged to have been committed, and that even if the facts alleged be true, no sentence could be pronounced.

*Id.* at 88. Therefore, prior to Idaho's existence, and the protections which we now take for granted, a person could commit highway robbery, or any other crime, with impunity.

It is exactly these benefits and protections which allow the train crew members to work within Idaho in a secure manner. For if Burlington Northern were unable to operate its trains in Idaho, it would be unable to provide the jobs, and thus the wages, that the train crew members receive. It is this *opportunity to be employed* which has been held to constitute sufficient nexus for the state to tax the wages of a nonresident individual performing labor within the states borders. *See, Sjong v. State Department of Revenue, supra; Lung v. O'Chesky, supra; State of Alaska v. Petronia, supra; Jackling v. State Tax Commission,* 58 P.2d 1167 (N.M. 1936).

## IV.

## AN INCOME TAX ON WAGES EARNED FROM IDAHO SOURCES BY NONRESIDENTS DOES NOT VIOLATE THE COMMERCE CLAUSE.

Although the Commerce Clause and Due Process Clause are often discussed interchangeably,

> [t]he courts, however, have usually placed considerations of minimum contacts and sufficient nexus under the due process heading, while questions regarding the proper apportionment of income to the taxing state and the discriminatory impact of taxes are covered by the Commerce Clause. [Citations omitted.]

*Sjong v. State, Department of Revenue,* 622 P.2d at 973. The United States Supreme Court has held that:

> net income from the interstate operations of a foreign corporation may be subjected to state taxation provided the levy is not discriminatory and is properly apportioned to local activities within the taxing State forming sufficient nexus to support the same.

*Northwestern States Portland Cement Company v. Minnesota,* 358 U.S. 450, 452, 79 S.Ct. 357, 359, 3 L.Ed.2d 421, 424 (1959). What must be kept in mind is that corporations can only earn income by selling the services of its employees or selling goods. This is because the fictional corporate entity is not a physical being capable of having a presence in a specific location. Thus, any time a corporation transacts business in more than one state, and thereby is subject to tax in more than one state, a potential Commerce Clause issue arises.

However, the Commerce Clause itself is inapplicable to the present case. There is no sale of goods. The train crew members are not paying a fee for the privilege of being transported to a destination. There is not a sale of transportation services to the train crew members. The train crew members are not passengers, and should not be treated as such, despite the insistence of their counsel.

To the contrary, the train crew members are receiving wages in exchange for labor performed on the train. This distinction was emphasized in *Sjong* where the court stated:

The main distinction between the instant case and the situation described in the *Petronia* case is that Petronia earned his income while employed on a vessel in Alaska waters. Here, Sjong catches crab outside of Alaska in international waters and then sells them within the state.

622 P.2d at 971.

The *Petronia* court summarized this principle by stating that an income tax:

makes no attempt to interfere with or control the conduct of any business. It is not a privilege tax.

\*     \*     \*     \*     \*     \*

The instant tax is *not a direct tax upon interstate commerce* or the vessels engaged therein. *It is rather a tax upon the income derived therefrom,* properly proportioned so as to tax only that net income of seamen which is earned within the jurisdiction of Alaska. [Emphasis added.]

418 P.2d at 761.

Where the present case does not deal with the sale of goods within the taxing state, the Commerce Clause cannot be violated. Based on this reasoning, the cases relied upon in this Court's Opinion that deal with foreign corporations making sales within a taxing state are inapposite with regard to whether or not a nonresident individual has a sufficient nexus with the state he performs labor in.

### CONCLUSION

Based on the foregoing, the Idaho State Tax Commission respectfully requests the Court to modify its Opinion and hold that the Idaho Income Tax Act, imposing a tax on the income of train crew members performing labor on through trains while traveling through Idaho, does not violate the Due Process Clause of the Fourteenth Amendment or the Commerce Clause (Art. I, § 8, cl. 3) of the United States Constitution.

Upon doing so, the Court should consider the question of the applicable statute of limitations which has been fully briefed and argued and hold that, as a matter of law,

the statutes of limitation for state tax purposes does not begin to run until a taxpayer has properly filed the required return.

In any case, the Tax Commission requests that the Court clarify its original Opinion and articulate the standard to be employed by the Commission in administering the tax law when questions of nexus arise.

DATED this 29th day of June, 1988.